EXXON CORPORATION, Petitioner,

v.

Sue BRECHEEN et al., Respondent.

No. B-5168.

Supreme Court of Texas.

July 7, 1975.

Rehearing Denied Sept. 24, 1975.

Fulbright & Jaworski, L. S. Carsey, David J. Beck and Adele Black, Judy L. R. Fernald, Eino Zapata, Robert D. McGee, Houston, for petitioner.

Frank Stovall, Houston, Glenn & Thomas, Allen D. Glenn, Abilene, for respondent.

STEAKLEY, Justice.

On March 10, 1970, William D. Brecheen, Jr., a tank truck driver for Oil Transport Company, was injured by being sprayed in the face with oil while waiting for his truck to be loaded on the premises of Exxon's Baytown Refinery. On August 17, 1971, he filed suit to recover for his personal injuries. On December 19, 1972, Brecheen committed suicide with a rifle, leaving a note to his wife, Sue Brecheen. A suggestion of death was thereafter filed and Sue Brecheen moved that the suit proceed as an action for damages under the Survival Statute, Vernon's Tex.Rev.Civ.Stat.Ann. art. 5525, and as a suit under the Wrongful Death Act, Tex.Rev.Civ.Stat.Ann. art. 4671 et seq.

Upon trial, the jury found that Exxon was guilty of negligence proximately causing "the occurrence in question." Additionally, the jury found "that the oil spray incident in question caused William Brecheen to have the mental illness or disease made the basis of this suit"; and "that the oil spray incident in question caused the death of William Brecheen." Based upon these findings, the trial court rendered judgment for Sue Brecheen in the capacities which she sued, and against Exxon, in the respective sums of $6,000.95, for hospital, medical and funeral charges; $55,000 under Article 5525; $166,000.95 under Article 4671; and for Transport Insurance Company in the sum of $18,680.56 under its subrogation claim for sums paid Brecheen for Workmen's Compensation, medical and hospital benefits. This judgment has been affirmed by the Court of Civil Appeals, *Exxon Corporation v. Brecheen*, 519 S.W.2d 170. Exxon is our Petitioner here.

Exxon presents three groups of points. Two of these, which if sustained would require a reversal and a rendition for Exxon, are first considered and these we overrule; the third group, which we sustain, requires that we reverse the judgments below and remand the cause for a new trial.

Exxon's first group of points presents its suicide defense. The basic argument as to this is that Exxon is not liable for the suicide under any theory because there was no jury finding and the evidence failed to conclusively establish that Brecheen was without conscious volition and under an uncontrollable impulse at the time he took his life. Exxon cites principally *Jones v. Traders & General Ins. Co.*, 140 Tex. 599, 169 S.W.2d 160 (1943); *Scheffer v. Railroad Co.*, 105 U.S. 249 (1881), and *Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (1960).

In oral submission, and by post-submission briefs, Exxon argues further that it could not reasonably have anticipated that Brecheen would commit suicide following the oil spray incident; that there must be evidence that the mental illness caused Brecheen's suicide in the particular manner in which it occurred; and that the facts must establish that Brecheen's act of suicide did not flow from a conscious, deliberate choice on his part.

Sue Brecheen, on the other hand, says that the question is whether there is any evidence of probative value that Exxon's negligence proximately caused Brecheen to become insane, and, if so, whether such insanity caused him to take his life through an uncontrollable impulse. She argues that where there is a negligent act under common law that proximately causes insanity, and in turn, such insanity leads to the suicide of the injured person, then the actor cannot be relieved of liability for the death

as it flows naturally and foreseeably from the original act. So here, she says, the evidence establishes that the negligent act of Exxon caused Brecheen to become psychotic and rendered him devoid of realistic reasoning facilities; that this caused him to take his life through an uncontrollable impulse; and that his suicide was a part of an unbroken chain of events. She asserts that the recoveries here are consistent with *Jones v. Traders & General Ins. Co., supra,* and she relies particularly on the Restatement (Second) of Torts § 455 (1965), later considered.

The posture in which we are to consider the suicide defense of Exxon should be initially established. As noted before, the jury found that the negligence of Exxon proximately caused the oil spray incident that originally injured Brecheen and there is no attack on these findings. The jury further found that the oil spray incident caused Brecheen to suffer a mental illness or disease and that the oil spray occurrence caused his death. The only special instructions given to the jury in the court's charge were the accepted definitions of negligence, ordinary care and proximate cause; the latter included the Texas elements of cause in fact and foreseeability. There was no objection to the manner of submission and no request by any party for additional or different issues or instructions. With respect to deemed findings thus arising, Exxon acknowledges in its post-submission brief that it is before this Court "as if there was a finding in the trial court that Mr. Brecheen's death was proximately caused by Petitioner's negligence." As later stated, we adopt the Restatement view and upon trial following the remand we shall order, the case should be submitted in its terms.

· We first review the evidence which is outlined in detail in the opinion of the Court of Civil Appeals. Brecheen's injury occurred on March 10, 1970, when he was unexpectedly, and with severe impact, sprayed in the face by oil. He was standing on a platform engaged in conversation with another truck driver at which time a load-ing chute came lose from a nearby railroad tank car hatch and began to spray him and his companion. Brecheen testified by deposition prior to his death that he was hit "flush in the face" by the spray of oil, that the force of the impact knocked him against the rail of the loading platform and onto his hands and knees, that when the spray hit it was "like an explosion in my head" which "felt like it went in my eyes and out my ears" and that he was temporarily blinded and had to be led to the plant dispensary where he was cleaned and given pills for headaches.

Following treatment by the plant personnel, Brecheen picked up his loaded truck and proceeded to a Baytown motel where he spent the night. With the exception of a ringing in his ears, Brecheen's night was uneventful, and he left for Abilene early the next morning. About 70 miles outside of Abilene, Brecheen took a headache pill which had been given to him at the Baytown plant dispensary, and from then until sometime after that night, Brecheen had no recollection of his activities. His wife testified that Brecheen's behavior was extremely peculiar that night, that he talked of needing help in dressing himself so as to get on the road early, that he kept falling down and lacked coordination and that she finally had to call her brother to help in calming him down. Following this, Brecheen's behavior became more unnatural and erratic and he was plagued with medical problems for which several doctors could find no physical cause. He had no history of mental, psychotic or nervous problems prior to the accident.

In June, 1970, Brecheen commenced a series of consultations with Dr. Larry B. Summers, a family medical practitioner with special training in psychiatry. He was hospitalized in the West Texas Medical Center from September 16 through October 13, 1970, during which time Dr. Summers diagnosed his condition as being a conversion reaction with an underlying schizophrenic reaction; and that his schizophrenia was a

form of psychosis. He considered him to have a severe mental illness in which there had been no improvement "over a long period." On December 30, 1970, Brecheen was admitted to Timberlawn Psychiatric Hospital where he was treated by Dr. James Peden, a certified psychiatrist specializing in the practice of psychiatry. With respect to Brecheen, Dr. Peden found ". . . The content of his thinking had a paranoid tenor to it, but primarily was made up of ruminations about changes in his body, his vision, the fusion of his vision, migrating type of headaches and other what appeared to be distortions of his image of himself." He stated that Brecheen at that time did not have the capacity to adequately differentiate between that which was real and what his interpretation was of what was going on. He gave his impression that the patient was suffering from schizophrenia, which is "characterized by certain changes in the feeling and expressed feeling of the individual, certain changes in the way they associate things with each other, changes in the way they make decisions." Those suffering from this illness are ambivalent and have "a tendency toward withdrawal or investment of their feelings within themselves, primarily, sort of living in a dream world or fantasy world." He felt that the majority of the symptoms that Brecheen presented had a paranoid tenor or paranoid flavor to them. He gave an opinion that there was a causal relationship between the schizophrenia that he observed in Brecheen and the oil spraying incident which occurred in March of 1970.

Dr. Peden's discharge diagnosis was of schizophrenia residual type, i. e., there continued to be evidence of defective functioning of Brecheen's personality. Dr. Peden further testified that the stress and intense fear experienced by Brecheen was probably related to the fear that he was going to die, or be blind, or that he was going to be brain damaged.

Brecheen continued to be treated by Dr. Summers who last saw him on December 12, 1972. It was his view that Brecheen's condition then was the same as during the prior two years. It was his testimony that Brecheen was laboring under the schizophrenic or psychotic state when he committed suicide on December 19, 1972, and that this schizophrenic state was the same condition under which Brecheen had been laboring since the injury on March 10, 1970. Both Dr. Peden and Dr. Summers expressed the opinion that there was a causal relationship between the schizophrenia and the oil spraying injury; and Dr. Summers expressed the further opinion that in reasonable medical probability there was a causal relationship between the oil spraying injury and the suicide.

■ There are contrary indications in the evidence from which it could be concluded that Brecheen was lucid at the time he committed suicide; and that his suicide was voluntary and not attributable to an insanity caused by his injury many months before. The note he left to his wife was coherent and the manner of self-destruction appeared to be deliberate. There is, however, no indication that Brecheen was suffering undue pain or was subject to pressures from which an individual would incline to free himself by self-destruction. There was no evidence that Brecheen had talked about or threatened suicide, or had exhibited suicidal tendencies, or that he was unnaturally preoccupied with death. Apart from the question of whether a person in his right mind would ever commit suicide, there is evidence that Brecheen's state of mind was such that the fact finders could conclude that he no longer possessed the capacity to govern his conduct and was acting under an uncontrollable impulse when he destroyed himself.

The problem of death by self-destruction has arisen in three principal instances: claims under insurance policies excluding recovery if the insured died "by his own hand"; claims for death benefits under the provisions of Workmen's Compensation statutes; and, as here, claims for damages in negligence and wrongful death actions.

As to the former, see *Connecticut Mutual Life Ins. Co. v. Akens*, 150 U.S. 468, 14 S.Ct. 155, 37 L.Ed. 1148 (1893); *Mutual Life Insurance Co. of New York v. Terry*, 82 U.S. (15 Wall.) 580, 21 L.Ed. 236 (1872); *Voris v. T. E. I. A.*, 190 F.2d 929 (5th Cir. 1951); *Cooper v. Massachusetts Mutual Life Ins. Co.*, 102 Mass. 227, 3 Am.Rep. 451 (1869); *Newton v. Mutual Benefit Life Ins. Co.*, 76 N.Y. 426, 32 Am.Rep. 335 (1879); *Van Zandt v. Mutual Benefit Life Insurance Co.*, 55 N.Y. 169, 14 Am.Rep. 215 (1873); *Aetna Life Ins. Co. v. McLaughlin*, 380 S.W.2d 101 (Tex.1964); *Illinois Bankers' Life Ass'n v. Floyd*, 222 S.W. 967 (Tex.Com.App.1920, holding approved); *Mutual Life Ins. Co. v. Walden*, 26 S.W. 1012 (Tex.Civ.App.1894, writ dism'd).

The cases considering the problem of whether the family of a workman may receive Workmen's Compensation benefits when he commits suicide are collected in Annot., *Suicide as Compensable Under Workmen's Compensation Act*, 15 A.L.R.3d 616 (1967). The distinction between what became known as the *Sponatski* rule—the voluntary willful-choice test—formulated by the Massachusetts Supreme Court in 1915, *In re Sponatski*, 220 Mass. 526, 108 N.E. 466, and the chain-of-causation test formulated in other jurisdictions, is there drawn. It is pointed out in the annotation that the latter rule rejects the tort liability concept of fault which stresses intervening cause and substitutes therefor the chain-of-causation or "but for" test, together with the requirement of an uncontrollable compulsion to commit suicide. The compulsion, however, need not be abrupt or unpremeditated. The Workmen's Compensation case of *Jones v. Traders & General Ins. Co.*, *supra*, is generally cited as following the Sponatski rule. We have reviewed the problem in depth in *Texas Employers' Insurance Ass'n v. Saunders*, 516 S.W.2d 242, this day announced; we there held that the death of a workman who committed suicide was not willfully intentional within the statutory preclusion of recovery.

The principal negligence cases are *Scheffer v. Railroad Co.*, *supra*; *Tate v. Canonica*, *supra*; *Daniels v. New York, N. H. & H. R. Co.*, 183 Mass. 393, 67 N.E. 424 (1903); *Koch v. Fox*, 71 App.Div. 288, 75 N.Y.S. 913 (1902); *Orcutt v. Spokane County*, 58 Wash.2d 846, 364 P.2d 1102 (1961), and *Arsnow v. Red Top Cab Co.*, 159 Wash. 137, 292 P. 436 (1930).

With reference to Wrongful Death actions, an Annot., *Civil Liability for Death by Suicide*, 11 A.L.R.2d 751 (1950), contains this summary:

Where an action is brought under a wrongful death statute the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render defendant civilly liable. However, where the wrongful act produces such a rage or frenzy that the person injured by defendant's wrongful act destroys himself during such rage or frenzy, or in response to an uncontrollable impulse, the act is, according to many dicta, considered as within and a part of the line of causation from defendant's wrongful act to the suicide and defendant's act is held to be the proximate cause of the death.

With respect to negligence cases, Professor Prosser states this summary:

Some difficulty has arisen in cases where the injured person becomes insane and commits suicide. Although there are cases to the contrary, it is the prevailing view that when his insanity prevents him from realizing the nature of his act or controlling his conduct, the suicide is to be regarded as a direct result, and no intervening force at all, or else as a normal incident of the consequences inflicted, for which the defendant will be liable. The situation is the same as if he should hurt himself during unconsciousness or delirium brought on by the injury. But if the man is sane, or if the suicide is during a lucid interval, when he is in full command of his faculties, but his life has become unendurable to him by reason of

his injury, it is agreed in negligence cases that his voluntary choice is an abnormal thing, which supersedes the defendant's liability. Prosser, Handbook of the Law of Torts, § 44, at 280–281 (4th ed. 1971).

A study of these authorities discloses a noticeable trend from the strict view of *Scheffer v. Railroad Co., supra,*—that a suicide is not a result naturally and reasonably to be expected or foreseen from a negligently inflicted injury—to the broader view represented in *Orcutt v. Spokane County, supra,* and *Tate v. Canonica, supra,*—that there may be liability if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide. This is in keeping with current and more advanced medical and psychiatric knowledge and understanding of human behavior. It is evident that a person may know that he is destroying himself while at the same time he is unable to control his physical acts. The suicide should not bar a claim notwithstanding it can be said that he knew the nature and consequences of his physical acts. So we disagree with the distinction Exxon would draw in arguing the absence of evidence of the extent of Brecheen's derangement at the time he committed the act of suicide.

■ We are in agreement with the Restatement (Second) of Torts § 455, (1965), and adopt it as the rule in Texas:

§ 455. Acts Done During Insanity Caused by Negligent Conduct

If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

This is compatible with the Texas rule of foreseeability under which it is not required that the negligent actor anticipate just how injuries will grow out of the dangerous situation created by his negligence. See *Clark v. Waggoner,* 452 S.W.2d 437 (Tex. 1970); *Enloe v. Barfield,* 422 S.W.2d 905 (Tex.1967); *Biggers v. Continental Bus System,* 157 Tex. 351, 303 S.W.2d 359 (1957); *Sullivan v. Flores,* 134 Tex. 55, 132 S.W.2d 110 (1939). See also *Porter v. Puryear,* 153 Tex. 82, 262 S.W.2d 933 (1953).

By another group of points that would require a rendition in its favor if sustained, Exxon attacks the holding of the Court of Civil Appeals that sustained the action of the trial court in refusing to receive into evidence a purported release signed by Brecheen as a condition to entering the refinery premises. The document in question is headed "General Release and Agreement Regarding Traffic and General Instructions." Thereunder appeared the following:

In consideration of the permission granted me by Humble Oil & Refining Company, Enjay Chemical Company, and Esso Research and Engineering Company at my request, to enter their Baytown plants or premises at the time shown in column 6 below, I, by my signature in column 1 below, do hereby release and discharge Humble Oil and Refining Company, Enjay Chemical Company and Esso Research and Engineering Company, their officers and employees, from all liability to me, my heirs and legal representatives for all loss, damage, injury, or death to me or my property caused in whole or in part by the negligence of said Humble Oil and Refining Company, Enjay Chemical Company, Esso Research and Engineering Company, their agents or employees, while I am at said plant or premises.

By my signature in column 1 below, I also acknowledge receipt of a copy of the above named companies' traffic and general instructions Form No. 541–0015 and

hereby state that I have read and understand said instructions.

Immediately under the above writing were a series of seven columns calling for the signatures of persons entering Baytown plants or premises, the company or employer represented, the vehicle license number, the MD order number, the name of the person authorizing entry, and the time of entry and departure. The signatures of 18 different persons appear on the document, one of which was that of Brecheen.

It is apparent from the face of the document in question, together with the deposition testimony of Brecheen prior to his death, that the purported release of liability for damages suffered by anyone signing the form and caused by the companies named, or by their agents or employers, is a routine form which all persons entering the premises are required to sign.

■ Without further writing, suffice to state that we are in agreement with the holding of the Court of Civil Appeals that the showing of disparity of bargaining power was such that it would be contrary to public policy to enforce the document as releasing Exxon [the successor to Humble] of its liability for the injuries negligently inflicted upon Brecheen.

As indicated earlier, we sustain Exxon's group of points asserting that the trial court reversibly erred in excluding evidence establishing the ceremonial remarriage of Sue Brecheen. The admission of this evidence was mandated by Article 4675a that was added to Title 77, Revised Civil Statutes, 1925, as amended, by act of the Legislature which became effective April 9, 1973. This legislative act was captioned "An act relating to the admissibility of certain evidence in a wrongful death action," and provided as follows:

Art. 4675a. Proof of remarriage, etc.

In an action under this title, evidence of the actual ceremonial remarriage of the surviving spouse is admissible, if such is true, but the defense is prohibited from directly or indirectly mentioning or alluding to any common-law marriage, extramarital relationship, or marital prospects of the surviving spouse.

Acts 1973, 63rd Leg., p. 43, ch. 29, § 1.

■ The statute became effective after Brecheen's death but prior to the trial of this case. We agree with the holdings of the Court of Civil Appeals that Article 4675a is procedural and remedial in nature, and is constitutional; that the statute governs the proceedings in litigation pending on its effective date; and that the trial court erred in excluding evidence of the remarriage.

■ Our disagreement is with the further ruling of the Court of Civil Appeals that the error was harmless, and not reversible, because it could not be said that knowledge of the remarriage would have caused the jury to reduce the damage award. The Legislature has decreed in clear and explicit terms that evidence of the actual ceremonial remarriage of a surviving spouse is admissible in the statutorily authorized wrongful death action. The legislative determination forecloses judicial inquiry into the effect upon the fact finder of evidence that the surviving spouse has ceremonially remarried. It is the duty of the courts to apply the law as declared by the Legislature, and to give effect to its stated purpose or plan. See *Railroad Commission of Texas v. Miller*, 434 S.W.2d 670 (Tex. 1968); *State Board of Insurance v. Betts*, 158 Tex. 612, 315 S.W.2d 279 (1958). Article 4675a would be rendered ineffectual by an independent judicial determination that disregard of its terms in a given instance was harmless error.

The judgment of the Court of Civil Appeals is reversed and the cause is remanded to the trial court.