**TEXARKANA MEMORIAL HOSPITAL, INC. d/b/a Wadley Regional Medical Center Appellant,**

v.

**Carolyn FIRTH, Individually and as Administratrix of the Estate of Margaret Wagner, Deceased, Appellees.**

No. 9540.

Court of Appeals of Texas, Texarkana.

Jan. 20, 1988.

Rehearing Denied March 1, 1988.

Victor Hlavinka, Atchley, Russell, Waldrop & Hlavinka, Texarkana, for appellant.

E. Ben Franks, Lavender, Rochelle, Barnette, Franks, Arnold, Texarkana, Jerry L. Davis, Davis and Brock, New Boston, Paul Hoover, Texarkana, for appellees.

GRANT, Justice.

This is an action for damages resulting from the death of Mrs. Margaret Wagner while she was a patient in Texarkana Memorial Hospital (hereinafter referred to as the hospital). Mrs. Wagner died when she jumped through a window in her room on the fourth floor of the hospital. Her estate and survivors (hereinafter referred to as appellees) sued the hospital alleging negligence and gross negligence in its care of Mrs. Wagner. The jury found in favor of the appellees on all liability issues and awarded the appellees $467,985.82 in compensatory damages and $500,000 in exemplary damages. The exemplary damage award was based on a finding of gross negligence against the hospital.

On appeal, the hospital does not complain of the ordinary negligence and compensatory damage findings, but contends that there is insufficient evidence or no evidence to support the gross negligence and exemplary damage findings. The hospital contends alternatively that the trial court erred in failing to order a remittitur of the award of exemplary damages, because this award was due to passion, bias or prejudice.

■■■ The injury, being wrongful death, is one in which exemplary damages are permitted by our State Constitution when gross negligence is shown. Tex.Const. art. XVI, § 26. Ordinary negligence is lifted to the level of gross negligence by the defendant's mental attitude. This attitude is a state of mind amounting to conscious indifference to the rights, welfare and safety of others and can be inferred from all of the acts, omissions and circumstances. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex. 1981). Conscious indifference relates to the defendant's mental attitude and "denotes a decision, in the face of an impending harm to another party, to not care about the consequences of the act which may ultimately lead to that harm." *Williams v. Steves Industries, Inc.*, 699 S.W.2d 570 (Tex.1985). To establish gross negligence, there must be evidence which makes it fair to conclude that the defendant had decided to ignore the rights of the injured party, even in light of the probable and threatened injury. A plaintiff is not required to produce direct evidence of the defendant's subjective state of mind, but the mental state may be inferred when the evidence demonstrates that under all the circumstances a reasonable, prudent person would have realized that his conduct created an extreme degree of risk to the safety of others. *Williams v. Steves Industries, Inc., supra.*

In deciding if there is any evidence to support a finding of gross negligence, we must consider only the evidence and inferences which tend to support the jury's finding and disregard all contrary evidence and inferences. *Williams v. Steves Industries, Inc., supra.* We must view the evidence

that tends to support the finding in its most favorable light. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). Insufficient evidence points require that we consider and weigh all the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). With these principles in mind, we consider the evidence in the record before us.

█ Wagner, a thirty-three year old woman, was brought to the hospital emergency room at about 1:45 a.m. on September 13, 1983. She was admitted by Dr. Hood, the emergency room physician, whose initial assessment was that Wagner had been nervous and upset for two months, was depressed and possibly suicidal, was unable to sleep and was hallucinating. The patient was given medication, and Dr. King, the hospital's staff physician for psychiatry, was called. King determined that Wagner was psychotic and requested that she be placed in the hospital's closed unit. He gave routine orders for laboratory work and prescribed a major tranquilizer (thorazine) and medication to counter its side effects (cogentin). Wagner was removed from the hospital emergency room approximately an hour and a half after her admission and was taken to room 414 in the open psychiatric unit, because the closed unit was fully occupied.

The closed unit is for dangerously ill patients and is secure at all times. The open unit is similar to any regular hospital unit where the patients are free to come and go and the doors are not locked. The windows in the open unit cannot be raised more than four inches, but they are not protectively screened. In the closed unit, the windows are protected by screens designed to prevent patient "elopement."

Wagner on two occasions threatened to jump out of the hospital room window. Wagner also told the nurse on duty that she felt someone was trying to kill her. Shortly thereafter, Wagner put on her clothes and attempted to leave the hospital. Dr. King ordered the dosage of Wagner's medication to be increased so that a "chemical straitjacket" effect would be achieved. He also ordered that Wagner's medication

be injected so that it would take effect more rapidly. Dr. King again asked a nurse to determine whether Wagner could be moved to the closed unit, but there was no room and no doctor with a closed-unit patient would agree to move a patient out of the closed unit to make room for Wagner. Dr. King increased Wagner's medication and also gave her intermuscular navane. He ordered that medication be given to Wagner at thirty-minute intervals until she went to sleep and that she be given an additional dose of navane at 9:30 p.m.

About 6:00 p.m., the nurse on duty in the open unit, Patricia Jewell, requested additional help because of the situation. Jewell's shift was to end at 7:00 p.m. The hospital supervisor on duty, Sam Haddock, at first refused to send any additional help. Then she informed him, "I have a patient who wants to jump out the window, seriously." He then replied that he would see what he could do. When Wagner was given her 6:05 p.m. medication, she acted afraid and stated that her husband was hurting her. Some forty minutes later she was "talking off the wall" and appeared wide awake. Additional medication was given by LVN (licensed vocational nurse) Henry at 7:00 p.m. At about 7:10, Haddock "floated" RN (registered nurse) Sterling to the open unit as additional help. Jewell advised Sterling that the patient needed someone with her constantly. Shortly after 7:30 p.m., the increased medication began to take effect, and Wagner's two adolescent daughters, who had been staying with her, went home.

At 8:30 p.m., Wagner was sitting up in bed appearing apprehensive. She was then given a backrub by Nurse Sterling. About 11:00 p.m., Sterling called Haddock, the supervisor, advising him that Wagner was asleep and sedated and that all was quiet on the floor, and requesting permission to go home. Haddock granted permission, but did not assign a replacement. Sterling testified that Wagner was quiet and sedated when she left, but that she did not know when Wagner might awaken. From that time until she jumped from the hospital

window, Wagner was left in the open unit and was tended to in routine fashion by those present in that unit: Nurse's Aide Joyce McGary and LVN Alexander. Neither of these nurses had substantial experience on the psychiatric ward. McGary testified that she checked Wagner every fifteen minutes, but she had also indicated that she made a notation in the records each time she checked Wagner. The notes indicate that either McGary or Alexander checked Wagner at two-hour intervals. Dr. King testified that it was a routine procedure of the hospital on the night shift for psychiatric patients to be checked every fifteen minutes and that he expected that routine to be carried out with Wagner. McGary said that she knew Wagner was suicidal, but that she did not know that Wagner had threatened to jump out the window.

A 6:00 a.m. entry by Alexander on Wagner's chart showed that Wagner was asleep at that time. When Judy Edwards, a hospital technician, was passing room 414 that morning, she heard a loud bumping noise. She looked into the room and saw Wagner sitting or crouching near the window and butting her head against the window. Edwards called Wagner's name, but was unable to get to her in time. Unrestrained by any means, Wagner had jumped to her death about 6:50 a.m., September 14, just as she had threatened to do. Attempts to resuscitate Wagner failed.

Appellees' expert witness, Dr. John Nottingham, testified that the overall care Wagner received while a patient at Wadley Hospital was inadequate. Specifically, he found the placement of Wagner in the open unit from 11:00 p.m. to 7:00 a.m. to have been inappropriate. He described the open unit as unsafe, placing special emphasis on the unscreened windows, and stated that it was particularly inadequate for a patient in Wagner's condition. He further testified that the staff monitoring of Wagner was insufficient, because the nurses could not know exactly when Wagner would awake. The evidence in the case also showed that there had been a closed psychiatric unit at the hospital for approximately twenty years, which had been full on many occasions requiring psychiatric patients to be placed in other areas of the hospital.

The circumstances which bear on the hospital personnel's state of mind include their negligent acts as well as the surrounding circumstances. The jury found the hospital to have been negligent in these particulars:

(1) Failing to monitor and observe Wagner properly to prevent injury to her;

(2) Failing to maintain the windows properly so as to prevent Wagner from escaping through the windows; and

(3) Failing to staff the psychiatric unit with properly trained nursing personnel.

The hospital contends that the failure to properly monitor and observe Wagner could not be the basis of gross negligence, because it was not authorized or ratified by a vice-principal of the hospital. The jury was instructed concerning this requirement as follows:

Before you are warranted in answering the above question "Yes", (referring to the gross negligence issue) the act or acts of negligence, if any that you have found must have been committed, authorized or ratified by a vice-principal or Wadley Hospital, which means:

(a) A corporate officer;

(b) Those who have authority to employ, direct and discharge servants of the corporation;

(c) Those engaged in the performance of nondelegable or absolute duties of the corporation; or

(d) Those to whom the corporation has confided the management of the whole or a department or a division of its business.

 The hospital argues that while it might be responsible for the actions of a registered nurse in charge, the nurses attending to Wagner were only a licensed vocational nurse and a patient care attendant, so that the hospital was not accountable for any of their acts which might constitute gross negligence. This would mean

that the hospital was liable when a registered nurse was in charge of the unit, but was no longer liable when the hospital placed a licensed vocational nurse or patient care attendant in charge of that same unit. Courts have not allowed a title designation to determine whether a corporation was liable when an employee was acting in a grossly negligent manner. *Purvis v. Prattco, Inc.*, 595 S.W.2d 103 (Tex.1980). In the *Purvis* case, the Holiday Inn's night auditor who was the senior employee present during the 11:00 p.m. to 7:00 a.m. shift was determined as a matter of law to be employed in a capacity which gave rise to exemplary damages on the part of the Holiday Inn for the employee's wrongful acts.

Under the definition of vice-principal, the jury certainly could have found that the nurses in charge of the open psychiatric unit were vice-principals who could bind the hospital. Furthermore, the jury could have found that the failure to have the window properly screened was a circumstance created by a policy decision of the hospital. We conclude that the acts and omissions found by the jury and all of the circumstances attendant to these acts and omissions provide sufficient evidence from which the jury could infer gross negligence. We find that there was sufficient evidence to support the jury's finding of gross negligence.

■ Next we address the hospital's contention that the trial court erred in failing to grant a remittitur of the exemplary damage award. Exemplary damages must be reasonably proportioned to actual damages, but there can be no set formula for the ratio between the amount of actual and exemplary damages. This determination must depend upon the facts of each particular case. Factors which are to be considered in determining whether an award of exemplary damages is reasonable include: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends the public sense of justice and propriety. *Alamo National Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981).

■ The injury is wrongful death, and the ratio between the exemplary damage and the actual damage is approximately one to one. The public rightfully expects the hospital to maintain safe conditions and to treat patients in accordance with their needs. In applying the five determining factors set forth above to the present case, we find the award of exemplary damages to be reasonable.

The judgment of the trial court is affirmed.

CORNELIUS, Chief Justice, dissenting.

I dissent because I do not believe there is any evidence of gross negligence on the part of the hospital or one of its vice-principals.

As the hospital is a corporation, punitive damages were properly imposed against it only if there is sufficient evidence of gross negligence committed, authorized or ratified by a vice-principal.[1] *Fort Worth Ele-*

---

**1.** As to gross negligence, the jury was instructed:
Was the negligence of Wadley Hospital, if any, that proximately caused the occurrence in question such as would amount to gross negligence?
You are instructed that "gross negligence" is the heedless and reckless disregard to the safety and welfare of Margaret Wagner. "Heedless and reckless disregard" means more than momentary thoughtlessness, inadvertence, or error of judgment, but is such an entire want of care as to indicate that such negligence was the result of conscious indifference to othe (sic) rights, welfare or safety of Margaret Wagner.

Before you are warranted in answering the above question "Yes", the act or acts of negligence, if any that you have found must have been committed, authorized or ratified by a vice-principal or Wadley Hospital, which means:
(a) A corporate officer;
(b) Those who have authority to employ, direct and discharge servants of the corporation;
(c) Those engaged in the performance of non-delegable or absolute duties of the corporation; or

*vators Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397 (1934), *overruled on other grounds, Wright v. Gifford–Hill & Co.,* 725 S.W.2d 712 (Tex.1987).

Gross negligence is such an entire want of care that raises the belief that the defendant's acts or omissions were the result of conscious indifference to the rights or welfare of the person injured. *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex. 1981). Conscious indifference relates to the mental attitude of the defendant. It "denotes a decision, in the face of an impending harm to another party, to not care about the consequences of the act which may ultimately lead to that harm." *Williams v. Steves Industries, Inc.,* 699 S.W.2d 570 (Tex.1985). To establish gross negligence, there must be evidence which makes it fair to conclude that the defendant had decided to ignore the rights of the injured party, even in light of the probable and threatened injury. *Williams v. Steves Industries, Inc.,* supra. Accordingly, conduct amounting to no more than momentary thoughtlessness, inadvertence or error of judgment will not constitute gross negligence.[2]

Appellees point only to the following acts and omissions as constituting some evidence of gross negligence:

(1) The hospital's failure to properly monitor Wagner. Specifically, they point to Sam Haddock's decision to allow RN Sterling to go home at 11:00 on the evening of the 14th, which left no registered nurse, but only an LVN and a PCA, in the open unit at that time to care for Wagner, and the hospital charts showing that Wagner was checked every two hours while asleep during the night of September 14.

(2) Failure to screen the windows in the open unit.

(3) Failure to staff the open unit with nurses properly trained to care for psychiatric patients.

(4) The cumulative acts of ordinary negligence.

(d) Those to whom the corporation has confided the management of the whole or a department or a division of its business.

The record establishes and appellees conceded that LVN's and PCA's were as competent to guard against a person attempting suicide as were nurses trained in psychiatry, so the failure to have such specially trained personnel available at all times in the open unit would not indicate a heedless and reckless disregard of Wagner's personal safety.

In arguing that the cumulative force of the negligent acts justifies the award of punitive damages, the appellees are really arguing that if several acts of ordinary negligence are proven the conduct then becomes gross negligence. As a general proposition, that will not stand critical analysis. A person may be negligent in several different respects and still not have the mental attitude required to raise ordinary negligence to the level of gross negligence.

Of the remaining three instances of conduct cited as gross negligence, only two can be attributed to the hospital directly or to one of its vice-principals. They are the failure to screen the windows and Sam Haddock's permission for RN Sterling to go home at 11:00 on the evening of the 14th. Assuming that the nurses failed to check Wagner every fifteen minutes as required by the hospital rules, that omission is not an omission of the hospital or a vice-principal.

While under the record here the failure to screen the windows and Haddock's permission for Sterling to leave could be considered ordinary negligence, that conduct does not indicate that the hospital decided, "in the face of an impending harm to another party, *to not care* about the consequences of the act...." *Williams v. Steves Industries, Inc.,* supra (emphasis added). The evidence shows that the hospital did care about Wagner's safety. The fact that its care was found to be inadequate and to some extent based upon faulty judgment does not make its conduct gross negligence. If it can be considered

2. The jury in this case was so instructed in Special Issue No. 9.

that there is some evidence of gross negligence, I find it factually insufficient to support the jury's finding.

For the reasons stated, I would reform the judgment to eliminate the award of punitive damages.

### ON MOTION FOR REHEARING

 The hospital contends on rehearing that Dessie Ray Lewis, R.N., was supervising the entire psychiatric unit, and therefore the team leader, Ms. Alexander, could not be a vice-principal. We have again reviewed the record on that point. Neither Lewis nor any other witness testified that the open unit was under her supervision. When asked where she was working on the night of the occurrence in question, Lewis testified that she was in the closed unit that night. She testified that the R.N. on duty always assesses new patients and writes up the admission notes, and that she had done so for Ms. Wagner upon Ms. Wagner's admission to the hospital. She further testified that after writing up the nurse's notes and conferring with the team leader, "I returned to *my* unit, the closed unit...." (Emphasis added.)

When asked how she became involved with the open unit at the shift change, Nurse Lewis replied that she communicated with the R.N. coming on for the open unit, because there was not an R.N. on the open unit, and that "[W]e always communicate with each other between the shift change." When asked if she had participated at all in Ms. Wagner's care on the night in question, she testified that she had not.

The record further indicates that there is a separate nurse's position in both the closed unit and the open unit. Stewart Powers, an employee of the hospital, testified that "[t]he registered nurse will always be in the Closed Unit with an aide...." He further testified that Dessie Lewis was assigned to the closed unit and that the registered nurse on the closed unit "would always get involved in admissions, any problems, and be the person who this person would answer to. If this R.N. were not able to for whatever reason, then she

would have needed to call the House Supervisor, who would then take on the responsibility."

When Nurse Lewis was asked if she made the rounds through the open unit during the night shift, she answered that she did most of the time, and then the question was asked, "But who was the team leader in that open unit that night?" Her answer: "Ms. Alexander."

We find that there was sufficient evidence from which the jury could conclude that the team leader Alexander had management of the open unit of the psychiatric ward.

The motion for rehearing is overruled.