**SHELL OIL COMPANY, Appellant,**

v.

**Betty Darlene HUMPHREY, Appellee.**

**No. B14–93–00443–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

June 16, 1994.

Rehearing Denied July 21, 1994.

L. Chris Butler, Houston, for appellant.

Alton C. Dodd, Alvin, Anthony D. Sheppard, Joe Crabb, Houston, for appellee.

Before SEARS, LEE and JUNELL (Sitting by Designation), JJ.

## OPINION

LEE, Justice.

This is an appeal from a judgment awarding Betty Darlene Humphrey exemplary damages on her claim of gross negligence against Shell Oil Company in the termination of employment of her husband which she alleged resulted in his suicide. Appellant, Shell Oil Company, brings three points of error. Because we find that Shell owed Humphrey no duty of care in the termination of his at-will employment, we reverse and render judgment in favor of Shell.

Michael Humphrey began full-time employment with appellant in June 1981. In

early 1985, a psychiatrist, Dr. Jeffery Tate, diagnosed Humphrey as having paranoid schizophrenia. Michael was hospitalized in April 1985, and upon his release, Dr. Tate allowed him to return to work with no restrictions. In August 1985, Humphrey was hospitalized again and was later released to return to work with no restrictions.

Humphrey's wife, appellee, testified that during this second hospitalization she spoke with Herman Mayo, her husband's supervisor at Shell. She testified that Mayo told her he would advise her if Humphrey's job performance declined or if Shell decided to terminate his employment. Mayo testified that he only told appellee her husband would not be fired while he was in the hospital.

In January 1986, Humphrey was hospitalized again. He expressed irrational fears of arrest and interpreted headlights and windshield wipers as signs of a conspiracy. Dr. Tate also testified that Humphrey was using drugs, including marijuana and amphetimines. Dr. Tate released him to return to work with no restrictions. There was also testimony that Humphrey did not consistently take his medication or attend meetings or appointments with Dr. Tate.

In March and April of 1986, Humphrey received counseling about his job performance and was warned that future problems could result in disciplinary action. In June 1986, Humphrey was sent to see Dr. Joseph Davis, a physician at the Shell on-site medical clinic, who found Humphrey disturbed and depressed. Humphrey also stated that he owned two pistols. Throughout June of 1986, Humphrey continued to exhibit poor job performance and on July 8, 1986, he was fired by Mayo, his supervisor, and Richard Cornman, the manager of the department. They testified that he did not appear upset during the meeting and he left the premises without incident.

Appellee testified that, when her husband arrived home, he was upset and began packing bags. She was unable to prevent him from leaving. Three days later, Humphrey telephoned appellee from Denver, Colorado. Appellee flew to Denver to try to bring him home, but she was unsuccessful. On July 19, 1986, Humphrey appeared at his parents' home in Conroe. The next day, appellee again visited him, but he became upset when she mentioned hospitalization. Humphrey then fled in his truck. He telephoned his wife on July 21, 1986 from DFW airport and, during that conversation, he committed suicide after telling appellee that people were coming after him.

Appellee filed suit against Shell under the Texas Wrongful Death statute, alleging negligent and wrongful discharge, intentional and negligent infliction of emotional distress, and gross negligence. Appellee also named as defendants Herman Mayo and Richard Cornman, but they were later nonsuited. Trial was to a jury. The case was submitted on three theories: negligence and gross negligence, discrimination, and intentional infliction of emotional distress. The jury found Shell and Humphrey negligent and apportioned 40% of the negligence to Shell, 60% to Humphrey. Because the jury found Humphrey at least 50% negligent, they did not reach the actual damages issues. The jury answered the discrimination and intentional infliction of emotional distress issues in favor of Shell. Finally, the jury found that Shell's actions constituted gross negligence and they awarded appellee $700,000.00. The trial court entered judgment on the verdict.

In its first point of error, Shell asserts that there is no duty of care in the termination of an at-will employee. Before we discuss Shell's argument, we turn to appellee's contention that this point of error is waived.

■ Appellee asserts that Shell did preserve its right to assert "no duty" on appeal because it did not plead the defense of no duty and it did not object to the jury issues on negligence. Appellee further contends Shell's pleading that the Worker's Compensation Act provided appellee's sole remedy obviated appellee's burden to prove ordinary negligence. Shell's pleading of the Worker's Compensation statute was inconsistent with other defenses asserted and as such, cannot be taken as an admission of fact. *Lunsford v. Sage, Inc. of Dallas*, 438 S.W.2d 615, 618 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.). Additionally, appellant moved for directed verdict, partially upon the de-

fense of applicability of the Worker's Compensation statute, and the trial court denied this motion. The case was not submitted as a Worker's Compensation case. Instead, it was submitted on theories of ordinary and gross negligence, discrimination, and intentional infliction of emotional distress.

 Furthermore, appellee errs in claiming that Shell was required to plead a defense of "no duty" to raise this issue on appeal. The existence of a duty of care was an element of appellee's cause of action for negligence. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). Shell also had no obligation to object to any questions submitted unless it intended on appeal to challenge the submission of those questions. *See* TEX.R.CIV.P. 278. Shell has not challenged the submission of the negligence questions; instead, Shell has challenged the legal sufficiency of the evidence to support the findings of ordinary or gross negligence because no duty of care was owed. Such a complaint may be made for the first time after the verdict, TEX.R.CIV.P. 279, and Shell preserved this complaint by raising it in a motion for judgment notwithstanding the verdict. *Steves Sash & Door Co. v. Ceco Corp.*, 751 S.W.2d 473, 477 (Tex. 1988).

 We interpret Shell's first point of error to raise a challenge to the legal sufficiency of the evidence. Legal sufficiency of the evidence points of error may only be sustained when the record discloses:

(1) a complete absence of evidence of a vital fact;

(2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact;

(3) the evidence offered to prove a vital fact is no more than a mere scintilla; and

(4) the evidence established conclusively the opposite of the vital fact.

*Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990). In reviewing a no evidence point, we may consider only the evidence and inferences tending to support the verdict and disregard all contrary evidence. *Id.* at 666.

 The jury's finding of gross negligence was conditional upon a finding of ordinary negligence by Shell. Other than in worker's compensation cases, in which suit may be brought for gross negligence without a finding of ordinary negligence,[1] a finding of ordinary negligence is prerequisite to a finding of gross negligence. *See Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946, 949 (Tex.App.—Austin 1990, writ denied). Although gross negligence refers to a different character of conduct, a party's conduct cannot be gross negligence without being negligent. *Id.* With ordinary negligence, the actor fails to use ordinary care. *Id.* Gross negligence, on the other hand, involves a more extreme departure from ordinary care in that the defendant must have consciously disregarded the safety of the plaintiff and the defendant's conduct must create an extreme degree of risk. *See Transportation Ins. Co. v. Moriel*, 37 Tex.Sup.Ct.J. 450, 458 (Feb. 2, 1994). Thus, to uphold the finding of gross negligence in this case, we must find that Shell owed a duty of care to Michael Humphrey.

 The general rule in actions brought under the wrongful death statute is that suicide is an intervening force that breaks the line of causation from the wrongful act to the death.[2] *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 523 (Tex.1975) (citing Annotation, *Civil Liability for Suicide*, 11 A.L.R.2d 751 (1950)). Where the wrongful act, however, "produces such rage or frenzy that the person injured by defendant's wrongful act destroys himself during such rage or frenzy, or in response to an uncontrollable impulse, the act is ... considered as within and a part of the line of causation from defendant's wrongful act to the suicide

---

1. *See Wright v. Gifford–Hill & Co.*, 725 S.W.2d 712, 714 (Tex.1987) (citing to TEX.REV.CIV.STAT. ANN. art. 8306, § 5 (Vernon 1964) (repealed 1989)).

2. We include this discussion of the law regarding negligence and suicide because it illustrates when a party can be held liable for a suicide. The typical defensive arguments in suicide cases are those challenging proximate cause, but appellant has not challenged causation in this case.

and defendant's act is held to be the proximate cause of the death." *Id.* In *Brecheen*, Texas adopted RESTATEMENT (SECOND) OF TORTS § 455, as set out below:

§ 455. Acts Done During Insanity Caused by Negligent Conduct

If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

The existence of duty is a question of law for the court to determine from the facts surrounding the incident in question. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990). In determining whether the defendant was under a duty, the court considers several interrelated factors, including "the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Id.* Of these factors, foreseeability is the dominant consideration. *Id.* As to foreseeability of the risk of danger, a defendant need not have anticipated the particular accident for a duty to arise. *Haight v. Savoy Apts.,* 814 S.W.2d 849, 853 (Tex. App.—Houston [1st Dist.] 1991, writ denied). If the risk reasonably appears or should appear that others in exercise of their lawful rights may be injured, then a risk of harm is held to be foreseeable. *See id.*

Section 455 is consistent with the Texas requirement of foreseeability of the risk in that the defendant need not anticipate just how injuries will arise from the dangerous situation created by his negligence. *Brecheen,* 526 S.W.2d at 534. In *Brecheen,* a tank truck driver was injured by a forceful spray of oil in his face. *Id.* at 521. Following the incident, the driver was temporarily blinded and had headaches and ringing in his ears. *Id.* The driver also began acting erratically and was eventually diagnosed as having a conversion reaction with an underlying schizophrenic reaction. *Id.* His treating psychiatrist believed that there was a causal relationship between the schizophrenia and the oil spraying incident. *Id.* at 522. The driver ultimately committed suicide. *Id.* Another of the decedent's doctors testified that, in his opinion, based on reasonable medical probability, there was a causal relationship between the oil spraying injury and the suicide. *Id.* Although the court reversed the case on other grounds, the court agreed that Exxon could be held liable for the driver's suicide where Exxon's negligent conduct brought about the driver's mental illness which resulted in an uncontrollable impulse to commit suicide. *See id.* at 524.

In the instant case, the jury was given an issue on negligence with an instruction mirroring § 455 of the Restatement.[3] The jury was not advised only to consider this instruction in answering the broad form negligence question, and thus, the jury was not limited to finding liability under this instruction taken from § 455.

■ Shell and amicus curiae argue that Humphrey was an employee-at-will and therefore, Shell could have discharged him at any time with or without cause and without liability for failure to continue employment. *Vallone v. Agip Petroleum Co., Inc.,* 705 S.W.2d 757, 758 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). In other words, Shell contends that, in the employment-at-will setting, the employer owes no duty of care with respect to the termination of employees. No authority supports a negligence exception to the employment-at-will doctrine. *See Jones v. Legal Copy, Inc.,* 846 S.W.2d

---

**3.** Such an instruction appears to be appropriate only in situations where the defendant's negligence results in an injury that produces a state of mind in the injured person which leads to his suicide, as in *Brecheen.* In the instant case, it is undisputed that Humphrey's schizophrenia did not result from an on-the-job injury. Although Shell objected to this instruction as inapplicable to the facts of the case, Shell has not challenged the submission of this instruction on appeal. Therefore, we may not address this issue.

**176**

922, 925 (Tex.App.—Houston [1st Dist.] 1993, no writ) (upheld trial court's dismissal of plaintiff's claims of tortious interference with contract, negligence, and gross negligence). Other than certain statutory and common law exceptions, the employment-at-will doctrine has been held to bar contract and tort claims based on the decision to discharge an employee. *Id.*

■ In her myriad reply briefs, appellee states that she does "not [dispute] the fact that Michael Humphrey was an employee-at-will generally speaking." Instead, appellee argues that the employment-at-will doctrine concerns issues of continuation of employment, which are not "directly related to the facts of this case." Appellee characterizes the issue in this case as "wrongful timing" of termination of employment that was "clearly contrary to Shell's contractual regime." Appellee cites to the Employment Agreement and a handbook entitled, "Highlights of Shell's Benefit Program," as evidence of this "contractual regime." The employment agreement merely evidences Humphrey's agreement, as a condition of his employment, about the assignment of rights to any inventions, disclosure of potential conflicts of interest, nondisclosure of confidential information, and the submission and transfer of required documents, such as proof of date of birth and academic records. This is an allegation of an implied contract based on the policy manual. "Employee handbooks, unaccompanied by an express agreement dealing with procedures for discharge of employees, do not create contractual rights regarding those procedures." *Vallone,* 705 S.W.2d at 759. Thus, we hold that neither of these documents limited Shell's right to terminate Humphrey's employment. Certainly, they did not require Shell to place Humphrey on disability leave instead of terminating him.

Appellee next asserts that Shell cannot be shielded from tort liability merely because the acts and omissions occurred in the context of an employment relationship. In sup-

port of this assertion, appellee cites *Hennigan v. I.P. Petroleum Co., Inc.,* 848 S.W.2d 276 (Tex.App.—Beaumont 1993), *rev'd on other grounds,* 858 S.W.2d 371 (Tex.1993). In that case, the appellant argued the trial court erred in granting summary judgment and dismissing her cause of action for intentional infliction of emotional distress because this cause of action was not based on termination alone. *Id.* at 279. The appellate court agreed that, *where the intentional infliction of emotional distress is independent of the discharge,* an employer cannot assert as a defense to the conduct that it was ancillary to the termination. *Id.* The *Hennigan* court found, however, that the plaintiff had alleged no tortious conduct independent of the termination. *Id.*

Appellee attempts to avoid this requirement of independence by characterizing her claims as ancillary to the discharge.[4] Appellee contends that Shell was negligent in its provision of medical services and in failing to adhere to its promise to warn her of Humphrey's imminent termination. Appellee also argues that Shell assumed a duty of care and cites § 323 of the Restatement (Second) of Torts which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 323 (1965).

Appellee attempts to characterize her claim as a type of medical malpractice claim in that she alleges that Dr. Davis was aware of Humphrey's deteriorating condition and

4. Appellee also cites a number of cases she characterizes as "delayed reaction" cases in which the employee suffers injury on the job, but the death or trauma occurs at a remote location. *See, e.g., Lujan v. Houston Gen. Ins. Co.,* 756 S.W.2d 295 (Tex.1988). These cases are easily distinguishable. These cases involve a duty of care to provide a safe work environment and are not support for the duty appellee wants us to create (i.e., a duty of care to prevent a schizophrenic employee from committing suicide after he is discharged from employment).

the possibility that he would be terminated. Based on this knowledge, appellee asserts that Dr. Davis should not have allowed Humphrey to return to work and that he should have notified Dr. Tate, Humphrey's treating physician or appellee of the increased danger of suicide. In other words, appellee argues that the risk of harm was foreseeable based on what Dr. Davis knew or should have known about Humphrey's mental condition.

The evidence shows that Dr. Davis was not a psychiatrist, but was a general practice doctor, providing on-site medical care at Shell. Dr. Davis saw Humphrey in June, just prior to his termination, at the request of one of Humphrey's supervisors. Dr. Davis met with him to review his condition as it affected his ability to perform on the job. Humphrey was not irrational when he visited Dr. Davis. Dr. Davis testified that Humphrey said he was not taking his medication and was not keeping up with his treatment. Dr. Davis urged Humphrey to get back into treatment and to take his medication. Dr. Davis did not even consider the possibility of termination or the effect termination would have on Humphrey. Dr. Davis further testified that he would not have predicted Humphrey's suicide. There is no evidence that Shell undertook to provide psychiatric services to Humphrey. In fact, Humphrey's treating psychiatrist testified that it would have been inappropriate for Shell to undertake treatment of Humphrey while he was under another doctor's care. Even if Shell had assumed a duty to provide medical services to Humphrey, it did not assume a duty to prevent Humphrey from harming himself where the risk of any type of harm from his discharge was not foreseeable.

Appellee also contends that Shell owed a managerial duty to warn Humphrey's wife of Shell's intent to terminate his employment. This relates to appellee's claim of wrongful timing of the discharge in that appellee claims she could have instituted proceedings to have Humphrey hospitalized if Shell had warned her of the impending discharge. The duty to warn arises from Mayo's alleged promise to advise appellee if there was a risk of termination.

Appellee cites a number of cases where an employer or caregiver has been held liable for injuries resulting from a breach of a duty to control the employee or patient. Generally, a party owes no duty to control the conduct of third persons, but where a special relationship exists between the actor and the third party, such a duty may arise. *Phillips,* 801 S.W.2d at 525. The employer-employee relationship is considered one of these special relationships. *Id.* The courts, however, impose liability on an employer only if the risk of harm is reasonably foreseeable. *Compare Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307 (Tex.1983) (employer could be held liable for persons injured in accident caused by intoxicated employee, where employer sent employee home knowing he was seriously intoxicated) *with Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523 (Tex.1990) (held that employer of taxi drivers could not be held liable for failing to warn drivers not to carry guns because the risk of harm was unforeseeable). We find *Otis Engineering Corp.* inapplicable to the present case because it extended a duty of care to those persons on the roadway with the intoxicated employee where the risk of harm to those unknown persons was reasonably foreseeable and the employer was in the best position to prevent the harm. Here, there is no duty of care owed to an employee with respect to his discharge from employment or where the risk of harm from discharge is not reasonably foreseeable. If we were to extend *Otis Engineering Corp.* to the termination of employees, there would be potential liability every time an employer discharged an employee.[5]

---

5. Appellee also cites a number of cases, which we find inapplicable to the instant case, holding a party liable when that party is in a position to control a dangerous person or to prevent harm. In each of these cases, however, the acting party knew or had reason to know of the risk of harm. Furthermore, the parties held liable were either therapists treating the mentally ill patients or the institutions confining them. *See Tarasoff v. Regents of University of Calif.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976) (held therapist liable where therapist was aware of risk of harm because mental patient had advised therapist of his intent to kill his girlfriend); *Williams v. United States,* 450 F.Supp. 1040 (D.S.D.1978) (held hospital had duty to notify county authorities, as

Appellee argues that, because appellee brought this suit under the Texas Wrongful Death statute, appellee stands in her husband's shoes, and the controlling issue is whether Shell was liable to her husband, not to her. *Washam v. Hughes,* 638 S.W.2d 646, 648 (Tex.App.—Austin 1982, writ ref'd n.r.e.). We agree with appellant that, even if Shell gratuitously assumed a duty to warn appellee, appellee cannot recover under the Wrongful Death statute unless she establishes a duty of care to her husband that Shell breached and which proximately resulted in his suicide.

Appellee's theory is that Shell breached an assumed duty to warn her of Shell's intent to discharge her husband, knowing that he was unstable and unpredictable, and that she was, therefore, unable to make arrangements for hospitalization of her husband to prevent his suicide. This is a novel theory, but it fails because it does not involve any duty of care to the injured party. There must be a duty of care owed to the injured party. *See Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990). Even if Shell assumed a duty to warn appellee, her suit is not based on any injury she suffered as a result of Shell's breach of this duty to warn. Instead, appellee reasons that the duty to warn her of the impending discharge of her husband, which is not a legally recognized duty, somehow incorporates a duty of care to her husband. As previously stated, there is no legal support for appellee's claim that Shell owed a duty of care in the termination of Humphrey's employment. Absent a duty owed to Humphrey, there can be no liability under the Wrongful Death statute. Because we find that Shell owed no duty of care to Humphrey in the termination of his employment, there can be no liability for gross negligence. Thus, we sustain point of error

one. We need not address points of error two and three.

We reverse and render judgment that appellee take nothing.

it had agreed to do, of release of a mental patient where hospital knew of patient's dangerous propensities); *Estate of Mathes v. Ireland,* 419 N.E.2d 782 (Ind.App.1981) (appellate court reversed dismissal of suit alleging negligence of mother and psychiatric center in failing to control mentally ill patient who killed plaintiffs' decedent); *Bradley Center, Inc. v. Wessner,* 161 Ga. App. 576, 287 S.E.2d 716, *aff'd,* 250 Ga. 199, 296 S.E.2d 693 (1982) (upheld liability of hospital who allowed mental patient an unrestricted pass

where patient had expressed homicidal thoughts about his wife and her lover and patient later murdered both parties). *See also Texarkana Memorial Hosp., Inc. v. Firth,* 746 S.W.2d 494 (Tex. App.—Texarkana 1988, no writ) (upheld liability of hospital for mental patient's suicide where hospital knew of patient's suicidal tendencies and failed to monitor her and maintain the hospital windows through which the patient jumped to her death).