James Raymond BLOUNT, Sr., Individually and on Behalf of the Estate Of James Raymond BLOUNT, Jr., and Lisa McCown, As Next Friend to Samantha McCown, Appellants,

v.

BORDENS, INC., Kenneth Fred Vessey, and W.C. Martin, Appellees.

No. 01–93–00271–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 3, 1994.

Rehearing Overruled March 2, 1995.

Jake Johnson, Valorie W. Davenport, Houston, for appellants.

Richard J. Jauma, David J. Sacks, Steven C. Howard, Houston, for appellees.

Before ANDELL, COHEN and WILSON, JJ.

## OPINION

ANDELL, Justice.

The appellants, plaintiffs below, seek the reversal of a take-nothing judgment rendered in a case arising from a fatal truck collision. We affirm.

### The Facts

On May 24, 1986, Fredrick Mark Martin (Martin) and James Raymond Blount, Jr. (Blount, Jr.) were the occupants of a pickup truck driving through Burnet County, Texas, on a state highway. The issue of who was driving the pickup is disputed, but there is evidence in the record that Martin was the driver. The pickup was pulling a horse trailer containing two racehorses. The boys had picked up the horses in New Mexico and were in the process of delivering them to Martin's father, W.C. Martin (W.C.), in Harris County. Although the issue of compensation is also disputed, there is evidence that the boys were going to be paid for the job.

Outside Marble Falls, the pickup collided head-on with a Bordens milk truck driven by Kenneth Fred Vessey (Vessey). Vessey was making deliveries at the time.

Immediately after the initial impact between the two trucks, the horse trailer rammed into the back of the pickup, rupturing its gas tank. The pickup and horse trailer caught fire. Martin, Blount, Jr., and the two horses were killed. The bodies of the two boys were burned beyond recognition. There is evidence in the record that, at the time of the accident, Martin had a blood alcohol level of .11 percent and Blount, Jr. had a blood alcohol level of .01 percent.

James Raymond Blount, Sr. (Blount, Sr.), individually and on behalf of Blount, Jr.'s estate, sued Bordens and Vessey. Bordens and Vessey filed a third-party action and cross-claim against W.C., individually and as surviving representative of Martin.

Lisa McCown (Lisa), as next friend to Samantha McCown (Samantha), joined the lawsuit as a plaintiff. Evidence demonstrated that Samantha is the daughter of Blount, Jr. and Lisa.

Trial was to a jury. The jury attributed negligence as follows:

Bordens 10%

Vessey 5%

Martin 80%

Blount, Jr. 5%

The jury made the following awards:

Blount, Jr. $5,500 (for pain, mental anguish, and funeral and burial expenses)

Blount, Sr. $75,000 (for past and future pecuniary loss, loss of companionship and society, and mental anguish)

Samantha $50,000 (for past and future pecuniary loss, loss of companionship and society, and mental anguish)

However, because the jury found that Martin and Blount, Jr. were engaged in a joint enterprise at the time of the accident, the percentage of negligence attributed to Martin was imputed to Blount, Jr. Because this elevated the negligence of Blount, Jr. to over 50 percent, all claims on his behalf, and all derivative claims, were barred. The trial

court therefore entered a take-nothing judgment against Blount, Sr. and Lisa.[1]

### Lisa's Points of Error One through Four: Evidence of Joint Enterprise

**A. Did the trial court err in admitting evidence that Blount, Jr. would "be able" to make a car insurance payment upon his return from the trip?**

In her first point of error, Lisa contends that the trial court erred in admitting evidence that Blount, Jr. would "be able" to pay his car insurance bill when he returned from the trip.

■ The defendants contended, and, as noted above, the jury found, that Martin and Blount, Jr. were engaged in a joint enterprise at the time of the accident. It was the defendants' burden to offer probative evidence in support of their contention. *See Rhea v. Williams,* 802 S.W.2d 118, 121 (Tex. App.—Fort Worth 1991, writ denied).

■ One of the elements of a joint enterprise is a "community of pecuniary interest" among the members of the group, i.e., that the participants in the alleged joint enterprise have some financial stake in their endeavor. *Rhea,* 802 S.W.2d at 121 (quoting *Shoemaker v. Estate of Whistler,* 513 S.W.2d 10, 16–17 (Tex.1974), which quotes RESTATEMENT (SECOND) OF TORTS § 491 cmt. c (1965)). The defendants offered the following testimony as evidence of a pecuniary interest in the trip:

> Q. (By counsel for Bordens and Vessey): The trip that [Blount, Jr.] was going on with Mark Martin, as I understand it, was to go get some racehorses and bring them back to town. Is that right?
>
> A. (By Blount, Sr.): That's—excuse me. That's what I understood.

Q. Did [Blount, Jr.] give you the indication that when he would be back, that he would be able to pay some bills?

> Counsel for Lisa: Objection, Your Honor. Hearsay.
>
> The court: Overruled.

Q. [D]id he give you that indication?

> . . . .

A. [H]e did have an insurance payment that was coming up on his car, and I was concerned about him being able to make that payment. *And he told me, he said, "Daddy, I'll be able to take care of that when I get back."*

(Emphasis added.) The appellees argue, and argued at trial, that this testimony indicates Blount, Jr. had a financial stake in the trip, because the fact that he would "be able" to pay his car insurance bill after his return from the trip is some evidence that he was to be paid for his role in transporting the horses.

■ Lisa attacks the admission of this testimony as hearsay.[2] The appellees argue that the testimony was properly admitted as a hearsay exception under TEX.R.CIV.EVID. 803(3). They contend that the testimony shows Blount, Jr.'s intent to pay his car insurance bill specifically upon his return from the trip, and that rule 803(3) allows the admission of such testimony. We agree.

Rule 803(3) allows the admission of the following:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates

---

1. In general terms, the rule of not allowing recovery in certain cases because of imputed negligence rests on the principle that the relationship existing between the injured person and the other party to the relationship renders it inequitable to permit the injured person to recover from a negligent third person if the injury resulted in part from the negligence of the other party to the

relationship. *See* 53 TEX.JUR.3d *Negligence* § 77 n. 76 (1987).

2. "Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX.R.CIV.EVID. 801(d).

to the execution, revocation, identification, or terms of declarant's will.

TEX.R.CIV.EVID. 803(3). There are few Texas cases construing this rule, and none relevant to the issue of whether Blount, Jr.'s intent to pay his car insurance bill upon returning from the trip is admissible. However, a review of pertinent cases from other jurisdictions with an identical rule weighs in favor of admissibility. Courts have favored the admission of statements that show the declarant's then-existing intent to perform an act in the future.

Texas' rule 803(3) is identical to the federal rule that addresses the same subject. *Compare* TEX.R.CIV.EVID. 803(3) *with* FED.R.EVID. 803(3). It is also identical to the Nebraska and South Dakota rules. *Compare* TEX. R.CIV.EVID. 803(3) *with* NEB.REV.STAT. § 27–803(2) (1989) *and* S.D.CODIFIED LAWS ANN. § 19–16–7 (1987).

In *Barnes v. Milligan*, 200 Neb. 450, 264 N.W.2d 186 (1978), the Supreme Court of Nebraska considered an action for trespass brought by a ranchowner against an adjoining ranchowner. 264 N.W.2d at 188. The adjoining ranchowner counterclaimed, asserting adverse possession of the disputed land. *Id.*

The trial court admitted evidence that showed that one of the adjoining ranchowner's predecessors in possession had not possessed the land in a hostile manner. 264 N.W.2d at 191. The evidence, a statement made by the predecessor, showed that the predecessor had "inten[ded] to pay rent" to the ranchowner. *Id.* at 191, 192. Citing Nebraska's equivalent of TEX.R.CIV.EVID. 803(3), the court held that the predecessor's "intention to pay rent" was admissible as an exception to the hearsay rule. *Id.* at 192.

The same court considered a similar scenario in *Fite v. Ammco Tools, Inc.*, 199 Neb. 353, 258 N.W.2d 922 (1977). In *Fite*, the plaintiff appealed from a workmen's compensation court's decision. 258 N.W.2d at 923. The workmen's compensation court "held that plaintiff had failed to maintain the burden of proving ... that her deceased husband ... was in the course of employment at the time of his death...." *Id.*

On appeal, the plaintiff argued that the compensation court erred when it "refus[ed] to admit into evidence certain statements of the decedent concerning his purpose or intent" that were relevant to the disputed issue of scope of employment. 258 N.W.2d at 923.[3] The Supreme Court of Nebraska noted that the excluded statements "evidenced a present intention to do a future act, and that act was to go to work." *Id.* at 925. The court held that, under Nebraska's counterpart to rule 803(3), "statements evidencing an intent, design, or plan to do some specific act in the future are admissible." *Id.* The court reversed and remanded the case to the compensation court. *Id.* at 926.

Federal courts are in accord. In *Driscoll v. United States*, 456 F.Supp. 143 (D.Del. 1978), *aff'd without op.*, 605 F.2d 1195 (3d Cir.1979), a widow sued the United States under the Federal Tort Claims Act to recover damages following the death of her husband in an airplane crash. 456 F.Supp. at 145. The plaintiff called a family friend as a witness at trial, and the friend testified that the plaintiff, prior to her husband's death, had planned to have a second child. *Id.* at 147. The defendant moved to strike the testimony. *Id.* The court denied the defendant's motion, writing that "this testimony was offered to establish [the plaintiff's] then-present state of mind, i.e., her plans," and citing FED.R.EVID. 803(3). *Id.*

The Ninth Circuit Court of Appeals considered the issue in *United States v. Silverman*, 861 F.2d 571 (9th Cir.1988), a criminal case. The defendant was convicted of, among other things, conspiracy to distribute a controlled substance. *Id.* at 572. The evidence against the defendant included statements made by a

3. The "certain statements" made by the decedent included the following: (1) "I'm going to have to go. I've got to go to work." (2) In response to a friend saying, "I have work to do," the decedent said, "So do I." 258 N.W.2d at 924.

co-conspirator, Pearl, to the effect that she (Pearl) was going to call "her brother." *Id.* at 579. The court, citing FED.R.EVID. 803(3), held that the statements were admissible: "Pearl's statements at the airport that she was going to call 'her brother' were admissible to prove Pearl's intent." *Id.*

The Supreme Court of South Dakota faced the issue in *Johnson v. Skelly Oil Co.*, 288 N.W.2d 493 (S.D.1980). There, the plaintiff appealed a judgment reversing an award of worker's compensation benefits. *Id.* Whether the plaintiff was in the course of her employment at the time of the accident was disputed. *Id.* at 494. The plaintiff's husband testified that the plaintiff had told him that she "ha[d] to stop at the post office to mail [some] letters" and that she would mail the letters "Monday morning when she could get some stamps." *Id.* The court held that the statements were admissible. *Id.*

We agree with these holdings. The rule allows the admission of statements that are probative of the declarant's then-existing intent, i.e., his intent at the time he made the statements, to perform an act at some time in the future. The trial court properly admitted the evidence that Blount, Jr. intended to make a car insurance payment specifically upon his return from the trip. We overrule Lisa's first point of error.

In Lisa's second, third, and fourth points of error, she attacks the trial court's submission of the joint enterprise issue, and the jury's finding of a joint enterprise, on the ground that there was no evidence, or factually insufficient evidence, of any of the four elements of joint enterprise.

■ In reviewing a "no evidence" point, we consider only the evidence and inferences that tend to support the finding, disregarding all evidence and inferences to the contrary. *Vannerson v. Vannerson*, 857 S.W.2d 659, 666 (Tex.App.—Houston [1st Dist.] 1993, writ denied). If there is any evidence of proba-

tive force, i.e., more than a mere scintilla, to support the finding, we will overrule the point. *Id.*

■ In reviewing a challenge to the factual sufficiency of the evidence, we consider, weigh, and examine all of the evidence that supports and is contrary to the finding. *Vannerson*, 857 S.W.2d at 666. We will set aside the finding only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that the finding is manifestly erroneous or unjust. *Id.*

**B. Was there sufficient evidence of a "community of pecuniary interest?"**

■ For the participants in the alleged joint enterprise to have a "community of pecuniary interest," they must have some financial stake in their endeavor. *See Rhea*, 802 S.W.2d at 121. Here, the evidence that Blount, Jr. was going to "be able to take care of" a car insurance payment upon returning from the trip supports the submission and the finding of Blount, Jr. having a pecuniary interest. The jury was entitled to conclude from Blount, Jr.'s statement that he would "be able to take care of" the payment after his return that Blount, Jr. was going to be *paid* for his role in transporting the horses, and that, upon his return, he would, after being paid, *then* "be able" to pay the bill from the money he received for doing the job. The properly admitted statement regarding Blount, Jr. being able to pay his car insurance bill specifically when he "g[o]t back" is some evidence that Blount, Jr. had a pecuniary interest in the trip.[4]

The Supreme Court of Texas has held that "[a]ny ultimate fact may be proved by circumstantial evidence." *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex.1993); *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 755 (Tex. 1975). That court has also held that "[a] fact is established by circumstantial evidence

---

4. Counsel for Bordens and Vessey reminded the jury of the evidence in closing argument: "[Martin and Blount, Jr.] went to get the horses.... a common business or pecuniary interest, to make money and pay bills...."

when the fact may be fairly and reasonably inferred from other facts proved in the case." *Russell,* 865 S.W.2d at 933 (quoting *Dallas County Flood Control v. Cross,* 815 S.W.2d 271, 279–80 (Tex.App.—Dallas 1991, writ denied)). "[J]uries do not need direct evidence on every point." *Cross,* 815 S.W.2d at 279.

Courts of appeal have held that, when the only evidence supporting a jury's finding is circumstantial evidence, that evidence will suffice to support the finding on appellate review. In *Torrez v. Standard Brand Paint,* 795 S.W.2d 13 (Tex.App.—El Paso 1990, writ denied), the jury returned a verdict for the plaintiff in a slip and fall case. *Id.* The trial court set aside the verdict and granted judgment n.o.v. for the premise owner. *Id.* The court of appeals held that, even though there was no direct evidence that tile residue had been left on the store's floor from the previous day, "the jury was entitled to infer" that fact and the fact that the premise owner's "employee had failed to clean it up after the store closed." *Id.* at 15. The court thus reversed the trial court's judgment and rendered judgment for the plaintiff. *Id.*

In *Bufkin v. Texas Farm Bureau Mut. Ins. Co.,* 658 S.W.2d 317 (Tex.App.—Tyler 1983, no writ), the jury found that the plaintiff in a lawsuit to recover fire insurance policy proceeds had intentionally set the fire himself. *Id.* at 319. The plaintiff contended on appeal that there was no evidence to support the jury's finding. *Id.* at 320. The court had no direct evidence that the plaintiff had set the fire, but held that "[i]n view of all the circumstances as developed at trial, it would have been almost impossible for anyone except [the plaintiff] or someone at his direction to start the fire." *Id.* at 320. The court therefore held that there was evidence to support the jury's finding that the plaintiff had set the fire. *Id.* at 321.

In *Cross,* too, a jury finding was upheld solely on the basis of circumstantial evidence. 815 S.W.2d at 280. In that case, which involved a real estate purchase, the court agreed with the defendant that there was no direct evidence that he had made the pay-

ments in question. *Id.* at 279. The court then held that the fact had been established by circumstantial evidence, and that such evidence was enough to support the jury's finding that he had made the payments. *Id.* at 280.

Here, the fact that Blount, Jr. was going to paid for his role in transporting the horses could be proved by circumstantial evidence alone. *Russell,* 865 S.W.2d at 933; *Farley,* 529 S.W.2d at 755. The fact that he was going to be paid is established by circumstantial evidence if that fact "may be fairly and reasonably inferred from other facts proved in the case." *Russell,* 865 S.W.2d at 933 (quoting *Cross,* 815 S.W.2d at 279–80). Another fact "proved in the case" is that Blount, Jr. would "be able" to make the car insurance payment when he returned from the trip. Thus, if it may be "fairly and reasonably inferred" from this proven fact that Blount, Jr. was going to be paid for his role in the trip, then the fact that he was going to be paid is established by circumstantial evidence. *Russell,* 865 S.W.2d at 933 (quoting *Cross,* 815 S.W.2d 271 at 279–80). It may indeed be "fairly and reasonably inferred" from the testimony that Blount, Jr. would "be able" to make the car insurance payment when he returned from the trip that Blount, Jr. was going to be paid for his role in the trip.

■ *Unassailable* proof that Blount, Jr. was going to be paid is not required; as the *Bufkin* court noted, the defendant's burden of proof on its defensive issue was by a preponderance of the evidence, not by an "absolute certainty." 658 S.W.2d at 320. Juries can make findings with *no* direct evidence to support them. *Cross,* 815 S.W.2d at 279. Under the authorities referred to above, the circumstantial evidence that Blount, Jr. was going to be paid was enough to support the conclusion that Blount, Jr. had a pecuniary interest in the trip.

The jury was also entitled to conclude that Martin, too, had a pecuniary interest in the trip. The jury heard evidence that Martin worked for his father. It also heard consid-

erable evidence that Martin had a much greater responsibility for the safe transport of the horses than Blount, Jr., had:[5]

Q. With regard to the driving of the pick-up truck and pulling the horse trailer, would that typically be Mark's [Martin's] responsibility?

A. (By Mrs. Martin, Martin's mother): Yes.

. . . .

Q. But generally in terms of driving the truck and pulling the trailer, that would be Mark's responsibility, wouldn't it?

A. Yes, uh-huh.

. . . .

Q. He [Martin] had made those trips before?

A. Uh-huh.

Q. Was he aware of the value of the racehorses that he was carrying?

A. Yes.

Q. And did he understand that level of responsibility?

A. Oh, yes.

Q. And did he know that his father would hold him accountable in the event anything happened to those horses?

A. Yes.

The jury was entitled to conclude that Martin, who worked for his father in the first place, and on whom the bulk of the responsibility for the safe transport of the horses rested, also had a pecuniary interest; that he, too, was being paid for his labor. Under the *circumstantial evidence* authorities referred to above, the circumstantial evidence that Martin was going to be paid was enough to support the conclusion that Martin had a pecuniary interest in the trip.

We hold that there is some evidence of probative force, more than a mere scintilla, on the element of a community of pecuniary

interest. A "scintilla" is a trace or a spark; a minute particle. *Henry S. Miller Co. v. Hamilton,* 813 S.W.2d 631, 634 n. 2 (Tex. App.—Houston [1st Dist.] 1991, no writ). The evidence discussed above constitutes more than a mere trace, spark, or particle of evidence on the element of a community of pecuniary interest.

In reviewing the record for the factual sufficiency of the evidence on community of pecuniary interest, we consider, weigh, and examine all of the evidence that supports *and* is contrary to the finding. *See Vannerson,* 857 S.W.2d at 666. Lisa points to no evidence that is contrary to the finding. *See Rhea,* 802 S.W.2d at 121. Nor are we able to independently find any evidence that Martin and Blount, Jr. were *not* going to be paid for transporting the horses.

■ The record does, however, contain evidence that Blount, Jr. was also motivated to make the trip because it would take him through New Mexico, where he was born. However, evidence of another motive to make the trip does not negate, or even contradict, the evidence that Blount, Jr. had a pecuniary interest in making the trip. Rather, it merely shows that he had more than one reason for going.

*Rhea* involved a similar scenario. On their trip, Mr. and Mrs. Rhea delivered tax documents to their tax consultant; however, in addition, Mrs. Rhea did some shopping, Mr. Rhea got a haircut, and they both visited the site where a new shopping center was to be built. 802 S.W.2d at 120, 121. The court held that the delivery of tax papers to their tax consultant demonstrated a community of pecuniary interest in the trip, notwithstanding that "each attended to personal matters." *Id.* at 121. Their attendance to personal matters during the trip did not vitiate their pecuniary interest in making the trip; nor, here, does Blount, Jr.'s desire to see the state of his birth vitiate his pecuniary interest in the trip transporting the racehorses. Rather, as with the Rheas, it just indicates

---

5. Martin's father owned one of the horses, which was valued at $50,000. The other horse was owned by a family friend, and was valued at $100,000.

dual purposes—one pecuniary, the other personal.

We hold that there is factually sufficient evidence on the element of a community of pecuniary interest.

**C. Was there sufficient evidence of an agreement?**

■ One of the elements of a joint enterprise is that there be "an agreement, express or implied, among the members of the group." *Rhea,* 802 S.W.2d at 121 (quoting *Shoemaker,* 513 S.W.2d at 16, which quotes RESTATEMENT (SECOND) OF TORTS § 491 cmt. c). The existence of an agreement can be implied from the fact that the group members were travelling together throughout the day of the accident. *See Rhea,* 802 S.W.2d at 121.

■ Here, however, the existence of an agreement is also shown by direct evidence. Blount, Sr. testified that he understood that Blount, Jr. and Martin were going to travel together to collect the racehorses and bring them to Harris County. Furthermore, Mrs. Martin testified that the pickup truck used by Blount, Jr. and Martin on the trip was used *only* in the transport of racehorses. At the least, these witnesses' testimony provides some evidence of an agreement between Blount, Jr. and Martin to transport the racehorses to their destination.

We hold that there is factually sufficient evidence of an agreement between Martin and Blount, Jr.

**D. Was there sufficient evidence of a common purpose?**

■ Another element of a joint enterprise is that there be "a common purpose to be carried out by the group." *Rhea,* 802 S.W.2d at 121 (quoting *Shoemaker,* 513 S.W.2d at 16, which quotes RESTATEMENT (SECOND) OF TORTS § 491 cmt. c).

Again, Blount, Sr. testified that he understood that Blount, Jr. and Martin were going to travel together to fetch the racehorses and bring them to Harris County. Furthermore, as also noted above, Mrs. Martin testified that the pickup truck taken by Blount, Jr. and Martin on the trip was used only to transport racehorses. The testimony of Blount, Sr. and Mrs. Martin indicates that Blount, Jr. and Martin had a common purpose for making the trip: to pick up the horses and deliver them to Martin's father in Harris County.

We hold that there is factually sufficient evidence of a common purpose between Martin and Blount, Jr.

**E. Was there sufficient evidence of "an equal right to a voice in the direction of the enterprise?"**

■ The fourth element of a joint enterprise is that there be "an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Rhea,* 802 S.W.2d at 121 (quoting *Shoemaker,* 513 S.W.2d at 17, which quotes RESTATEMENT (SECOND) OF TORTS § 491 cmt. c).

There is evidence in the record of this particular element. For instance, Mrs. Martin testified that Martin and Blount, Jr. went through Carlsbad, New Mexico, on the first day of the trip. When asked why the two had gone to Carlsbad, Mrs. Martin replied:

> They wanted to see the area, and [Blount, Jr.] had never seen Carlsbad; and it had been, oh, since [Martin] was a little boy since he had seen it, and he wanted to see it again ... They wanted to take their time and, you know, have an enjoyable trip and see the area because it's really a beautiful area.

The evidence indicates that Martin and Blount, Jr. were proceeding with the trip as they both wished to proceed. This is some evidence from which the jury could conclude that Martin and Blount, Jr. had an equal voice in the direction of the enterprise.[6]

In arguing that there was no equal right to a voice, Lisa points to the testimony of Mrs.

---

**6.** We note the observation of a Massachusetts court that an agreement regarding the route to be taken on a trip is a "factor[] which ha[s] traditionally been considered sufficient to establish such a right of control." *Stock v. Fife,* 13 Mass.App. 75, 430 N.E.2d 845, 848 (1982).

Martin, quoted earlier, that it was Martin's responsibility to drive the pickup truck and that Martin would be held accountable by his father if anything happened to the horses. We do not, however, view this testimony as conclusive on the issue of whether there was an equal right to a voice in the direction of the enterprise.

 Regarding Martin's responsibility to drive the truck, evidence that shows that a particular member of the group is responsible for one particular task, such as to drive the vehicle, is not evidence that mandates the conclusion that the other member of the group did not have an equal right to a voice. *See Fuller v. Flanagan,* 468 S.W.2d 171, 174–75 (Tex.Civ.App.—Fort Worth 1971, writ ref'd n.r.e.) (court found joint enterprise between driver and passenger even where passenger "made no effort to direct or control" the driver, had no driver's license, and did not know how to drive). The question is not whether Blount, Jr. had an equal responsibility to drive the truck, i.e., for the performance of one particular task, but whether he had an equal say *regardless* of what tasks he did or did not individually perform. That Martin was responsible for driving the truck does not compel the conclusion that Blount, Jr. did not have an equal voice.

Furthermore, Lisa's argument that there could not have been an equal right to a voice in the direction of the enterprise because it was Martin's responsibility to drive the truck ignores much case law, in this jurisdiction and others, where this element has been found despite the fact that one of the parties to the enterprise never drove the vehicle. *See, e.g., Fuller,* 468 S.W.2d at 174. If Lisa's contention is correct, a passenger who never takes a turn driving could never be a participant in a joint enterprise. This is not the law, and should not be.

Regarding the evidence that Martin would be held accountable by his father, the fact that one member of the group is uniquely accountable to the party that authorized the endeavor does not demonstrate that the other member did not have an equal say in the *direction* of the endeavor. Martin's accountability does not mean that Blount, Jr. did not have an equal say in the direction of the horses' transport; it means only that Martin would *personally* answer to his father in the event that something happened to the horses. Stated another way, one can have no accountability for the successful completion of a task, yet still have an equal say in the direction of its performance.

We hold that there is factually sufficient evidence of an equal right to a voice in the direction of the enterprise.

There was factually sufficient evidence to support the finding of a joint enterprise. We overrule Lisa's second, third, and fourth points of error.

### Lisa's Points of Error Five through Seven: Evidence of her Marriage

Lisa and Blount, Jr. met and dated in 1985. Their relationship produced one child, Samantha, who was born on July 15, 1986. Lisa and Blount, Jr. never married. In 1987, Lisa married Chris Cole (Cole). The trial court overruled Lisa's attempt, by motion in limine, to prohibit the defendants' attorneys from eliciting evidence of Lisa's marriage to Cole.

Lisa argues her fifth, sixth, and seventh points of error together. Each concerns the fact that the jury heard evidence of her marriage to Cole.

### A. The trial court's denial of Lisa's motion in limine

In her fifth point of error, Lisa contends that the trial court erred "when it denied [her] motion in limine as it related to evidence of [her] subsequent marriage" to Cole.

 A motion in limine does not preserve a complaint for appellate review. *Hartford Accident & Indemn. Co. v. McCardell,* 369 S.W.2d 331, 335 (Tex.1963); *Glenn v. Kinco Crane, Inc.,* 836 S.W.2d 646, 648 (Tex.App.—Houston [1st Dist.] 1992, no

writ). Whether the questions targeted by the motion in limine were asked or not, the specific error of overruling a motion in limine itself should not be regarded as harmful or reversible error. *McCardell,* 369 S.W.2d at 335; *Pan Am. Gas Co. v. Lobit,* 450 S.W.2d 877, 883 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.); *see Metro Aviation, Inc. v. Bristow Offshore Helicopters, Inc.,* 740 S.W.2d 873, 875 (Tex.App.—Beaumont 1987, no writ) ("The overruling of a motion in limine, while it may be error, is never reversible error."); *City of Wichita Falls v. Jones,* 456 S.W.2d 148, 150 (Tex.Civ.App.—Fort Worth 1970, no writ) ("[A] trial judge can never commit reversible error by just overruling a motion in limine which has as its objective the suppression of evidence.").

We overrule Lisa's fifth point of error. We are cognizant that, if a motion in limine is overruled, the evidence is offered, and an objection is made when the evidence is offered, error is preserved. *See Glenn,* 836 S.W.2d at 648. The circumstances under which Lisa's marriage to Cole came before the jury are addressed below.

## B. Lisa's objection to evidence of her marriage to Cole

In her sixth point of error, Lisa asserts that the trial court erred "in overruling [her] timely and repeated objections to all such evidence" of her marriage to Cole, "especially as it extended beyond the mere fact of the subsequent marriage and included facts pertaining to the stepfather/half sister/stepchild relationship."

The first time the jury heard evidence of Lisa's marriage was in the following exchange:

Q. (By Lisa's counsel): When was the person—or when was the next person you slept with after [Blount, Jr.]?

A. (By Lisa): *That was my husband.* It was about a year and three months later.

The second time was in the following exchange:

Q. (By Lisa's counsel): You are married at the present time?

A. (By Lisa): Yes, I am.

It was Lisa herself who originally brought her marriage before the jury. "A party on appeal should not be heard to complain of the admission of improper evidence offered by the other side, when he, himself, introduced the same evidence or evidence of a similar character." *McInnes v. Yamaha Motor Corp.,* 673 S.W.2d 185, 188 (Tex.1984); *accord Evans v. Covington,* 795 S.W.2d 806, 809 (Tex.App.—Texarkana 1990, no writ).

Furthermore, Lisa failed to object on the occasion of the defendants' first inquiry into the issue:

Q. (By W.C.'s counsel): Now, you married—is it Chris Cole?

A. (By Lisa): Yes.

Q. In '87?

A. Yes.

In order to preserve an appellate complaint regarding the admission of this evidence, Lisa must have timely objected to it. *Atlantic Richfield Co. v. Misty Prods., Inc.,* 820 S.W.2d 414, 420 (Tex.App.—Houston [14th Dist.] 1991, writ denied); Tex.R.App.P. 52(a). She did not so object. This complaint is therefore waived. *Atlantic Richfield,* 820 S.W.2d at 420.[7]

The only evidence Lisa refers to of her marriage to Cole that "extended beyond the mere fact of the subsequent marriage and included facts pertaining to the stepfather/half sister/stepchild relationship" is the following testimony:

Q. (By Lisa's counsel): With regard to Samantha now, she is aware that her father is her stepfather?

A. (By Lisa): Yes.

As noted above, "testimony to the same effect" was previously admitted without objection when it was offered by Lisa.

---

7. We also note the rule that a party waives any complaint if, as here, "testimony to the same effect has been previously admitted without objection." *Atlantic Richfield,* 820 S.W.2d at 420.

Q. Does she seem to have some sadness that she did not know her real father?

A. Yes, she does.

Q. Does she—why don't you tell this jury what she said to you when you told her that her father was really [Blount, Jr.].

A. She sat still for quite some time and she said, "Well, my daddy will never know what I look like and I won't ever know what he looks like," and then she made a remark about her stepfather. She said, "That's why he treats me a little different, a little bit meaner, you know, than my sister." But I hadn't really noticed that, you know, before she brought it out. But he does treat her a little differently.

Q. Now that you have heard that comment and looked, do you think that's true?

A. Yes, I do. I try to talk to him when I notice it. You know, I try to talk to him when, you know, they can't hear us.

Q. But you know he does treat her differently than his own child?

A. Yes, he does.

Q. With regard to that marriage, you have had some problems in that marriage?

A. Yes, I have.

As indicated, this testimony was solicited by Lisa herself. As such, she may not now complain of its admission. *McInnes,* 673 S.W.2d at 188; *Evans,* 795 S.W.2d at 809.

We overrule Lisa's sixth point of error.[8]

## C. Lisa's request for an instruction on mitigation of damages

■ In her seventh point of error, Lisa argues that the trial court erred in refusing her request for an instruction "which would have informed the jury that such subsequent marriage ... did not operate to mitigate the damages sustained by [Samantha] as a result of her father's death." Lisa requested that the trial court submit the following instruction to the jury:

> In assessing the damages, if any, to be awarded to Samantha McCown, you are instructed that those damages are not to be reduced because of the subsequent marriage of her mother, Lisa McCown.

The trial court refused to submit the instruction.

■ The trial court has discretion in determining which instructions should be submitted to the jury. *See* TEX.R.CIV.P. 277; *K–Mart Corp. Store No. 7441 v. Trotti,* 677 S.W.2d 632, 636 (Tex.App.—Houston [1st Dist.] 1984), *writ ref'd n.r.e.,* 686 S.W.2d 593 (Tex.1985). In deciding whether the trial court abused that discretion, we determine whether its' action was arbitrary or unreasonable. *Trotti,* 677 S.W.2d at 636.

In *Exxon Corp. v. Brecheen,* 526 S.W.2d 519 (Tex.1975), the Supreme Court of Texas considered the wrongful death "marital status" provision that was then found in TEX. REV.CIV.STAT.ANN. art. 4675a. The provision is now embodied, in identical text, in TEX.CIV. PRAC. & REM.CODE ANN. § 71.005 (Vernon 1986). The provision states:

> In an action under this subchapter [i.e., in a wrongful death action], evidence of the actual ceremonial remarriage of the surviving spouse is admissible, if true, but the defense is prohibited from directly or indirectly mentioning or alluding to a common-

---

8. We also reject Lisa's argument that TEX.CIV. PRAC. & REM.CODE ANN. § 71.005 (Vernon 1986) bars evidence of her marriage to Cole. Section 71.005 states:

In an action under this subchapter [i.e., in a wrongful death action], evidence of the actual ceremonial remarriage of the surviving spouse is admissible, if true, but the defense is prohibited from directly or indirectly mentioning or alluding to a common-law marriage, an extramarital relationship, or the marital prospects of the surviving spouse.

According to Lisa, "[a]s stated in that provision, only the fact of a ceremonial remarriage of the spouse of the deceased can be admitted in a wrongful death case.... The express language of the statute limits admissibility solely to ceremonial remarriage in cases involving the spouse of the deceased." We disagree. Nothing in the language of section 71.005 precludes evidence of the ceremonial marriage of a wrongful death plaintiff's mother who was never married to the decedent.

law marriage, an extramarital relationship, or the marital prospects of the surviving spouse.

In *Brecheen,* the trial court excluded evidence that the decedent's wife had ceremonially remarried. 526 S.W.2d at 525. The court of appeals held that the exclusion was error, but that it was harmless. *Id.*

The Supreme Court of Texas reversed. 526 S.W.2d at 525. The court wrote:

> Our disagreement is with the [ ] holding of the Court of Civil Appeals that the error was harmless, and not reversible, because it could not be said that knowledge of the remarriage would have caused the jury to reduce the damage award.

*Id.* This language indicates that, in a wrongful death action, a jury is entitled to consider the fact of a widow's remarriage *in awarding damages.*

It is reversible error in such a case for a trial court to exclude evidence of the ceremonial remarriage of the widow. *Brecheen,* 526 S.W.2d at 525. Concealing the widow's ceremonial remarriage from the jury removes from the jury's consideration a fact it is entitled to know, and consider, in arriving at its damages award. *See Conway v. Chemical Leaman Tank Lines, Inc.,* 540 F.2d 837, 838 (5th Cir.1976) (the court, in considering article 4675a, noted that concealing the widow's remarriage "can only have been to press upon the jury a condition contrary to fact *and to seek to derive benefits from the misleading impression so created.* . . ." (emphasis added)).

■ It is clear that trial courts are required to admit evidence of the ceremonial *re* marriage of a wrongful death plaintiff's mother; we can conceive of no reason why courts should not also allow evidence of the ceremonial *marriage* of a wrongful death plaintiff's mother in a case where the mother was never married to the decedent. If the jury is entitled to reduce the damages award because the wrongful death plaintiff's mother has *re* married, as it clearly is entitled to do under *Brecheen,* it should also be entitled to

reduce the damages award where the wrongful death plaintiff's mother has gotten married in a case where she was never married to the decedent. In both instances, the crucial fact is the same: *the mother has married after the decedent's death.* Whether it is a marriage or a *re* marriage makes no practical difference. The jury should be entitled to consider it.

We hold that the trial court did not act arbitrarily or unreasonably in refusing Lisa's proposed instruction. We overrule Lisa's seventh point of error.

### Lisa's Point of Error Eight: Evidence that Samantha was Told of her Biological Father's Identity

In her eighth point of error, Lisa contends that the trial court erred "in allowing evidence that it was counsel for the minor appellant who conferred with the mother of the child as to whether the child needed to be told of her father's identity and death prior to her attendance" at trial. The relevant testimony was as follows:

Q. (By W.C.'s counsel): And what was the decisive factor as to what determined your telling Samantha about [Blount, Jr.]?

A. (By Lisa): Well, we were going to tell her, anyway, but since we found out that she needed to be here, I thought it best that we go ahead and talk with her before she came here so she wouldn't be confused about anything she heard.

Q. It's your testimony that it was your decision and not someone else's as to whether it was in Samantha's—

A. Yes. Yes. I wanted her to know.

Q. You didn't rely upon anyone else to make that decision?

A. No.

Q. Do you remember being asked that same question during your deposition?

A. No.

W.C.'s counsel: May I approach the witness, Your Honor?

The court: Yes.

Q. Do you recall being asked on page 44, line 16, that question?

A. Yes, I do.

Q. What was your answer to that same question I just asked you?

A. "If [Lisa's counsel] feels it's in her best interest, yes."

Q. At that time, it was someone else's decision than yours, correct?

A. I thought it would be best to talk with [Lisa's counsel] first before making the decision.

None of these questions or answers were objected to by Lisa. The complaint is therefore waived. *Atlantic Richfield*, 820 S.W.2d at 420; Tex.R.App.P. 52(a).

We overrule Lisa's eighth point of error.

**Lisa's Point of Error Nine: The Trial Court's Instruction on Loss of Companionship and Society and Mental Anguish**

 In her ninth point of error, Lisa argues that the trial court erred in submitting the following instruction to the jury:

> In determining damages for elements b [loss of companionship and society] and c [mental anguish], you may consider the relationship between [Blount, Jr.] and Samantha McCown, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities. You are reminded that elements b and c, like the other elements of damages, are separate, and, in awarding damages for one element, you should not include damages for the other.[9]

Lisa contends that the factors in the instruction "had absolutely no relevance to a situation involving an unborn child and implied that unless there was a relationship prior to

death ... damages for loss of parental society were negligible and/or should not be awarded."

Blount, Jr. and Samantha had no interaction; Samantha was not told of her father until after suit was filed, and Blount, Jr. did not know that he had a daughter. They had no "living arrangements," time together, "family relations," or any known "common interests and activities."

Nevertheless, the factors were relevant. In considering the "relationship" between Blount, Jr. and Samantha, the jury was entitled to take into account that they had no interaction or awareness of each other at the time that Blount, Jr. died. In being told it may consider their "relationship," the jury is also told that it may consider the fact that the two had *no* involvement or association and no knowledge of each other's existence. Telling the jury that it may consider their relationship allowed the jury to do just that; in this case, the state of their relationship was that they had no relationship, a fact the jury was entitled to regard if it wished.

Furthermore, the instruction does not imply "that unless there was a relationship prior to death ... damages for loss of parental society were negligible and/or should not be awarded." It merely informs the jury that it "may" consider certain factors which, in this case, were absent, and thus that it may consider the very absence of those factors. Indeed, if, as Lisa suggests, the jury was misled into thinking that, without evidence of a prior relationship between Blount, Jr. and Samantha, damages should be negligible or not awarded at all, the jury would not have awarded Samantha $50,000.

In her brief, Lisa also contends that, "[i]n essence, the court's charge constituted a comment on the weight of the evidence...." We disagree, for the reasons stated in the above paragraph. However, we also note that Lisa did not object to the charge on this ground in the trial court. When a party

9. This is the standard instruction in wrongful death cases. *See Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex.1986).

objects to a charge at trial, it is confined to that objection on appeal; any new objection added on appeal is waived. *E.P. Operating Co. v. Sonora Exploration Corp.*, 862 S.W.2d 149, 153 (Tex.App.—Houston [1st Dist.] 1993, writ denied); *Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d 131, 135 (Tex.App.—El Paso 1992, writ denied); Tex.R.Civ.P. 274.

We overrule Lisa's ninth point of error.

### Lisa's Points of Error 10 and 11: The Jury's Damages Award to Samantha for Pecuniary Loss

In her tenth and eleventh points of error, Lisa argues that the trial court erred in entering judgment based on the jury's award of $50,000 to Samantha for pecuniary loss. Lisa asserts the award is against the weight and preponderance of the evidence and that "a far greater sum was established as a matter of law."

We held above that the jury was entitled to conclude that Blount, Jr. and Martin were engaged in a joint enterprise at the time of their deaths. Based on that finding, the percentage of negligence attributed to Martin was imputed to Blount, Jr. Because this elevated the negligence attributed to Blount, Jr. to over 50 percent, all claims on his behalf, and all derivative claims, were barred. The trial court therefore rightly entered a take-nothing judgment against Lisa, who sued as next friend to Samantha.

As a result, even if we agreed with Lisa on these points, Samantha could still receive no damages award. These points are therefore moot and we decline to consider them.

### Lisa's Point of Error 13: Admission of the Police Report

In her thirteenth point of error, Lisa asserts that the trial court erred in admitting "hearsay evidence and/or mere speculation as contained in the police officer's report."

When counsel for Bordens and Vessey offered the police report into evidence, Lisa's counsel did not object. Counsel for W.C.

objected, but Lisa's counsel did not join his objection or make one of her own. The court admitted the report into evidence, and counsel for Bordens and Vessey proceeded to ask questions from it. Because Lisa's counsel did not object to the admission of the report, she has waived any error in its admission. *Celotex Corp. v. Tate*, 797 S.W.2d 197, 201 (Tex.App.—Corpus Christi 1990, no writ); *HOW Ins. Co. v. Patriot Fin. Servs.*, 786 S.W.2d 533, 544 (Tex.App.—Austin 1990, writ denied); *Wolfe v. East Texas Seed Co.*, 583 S.W.2d 481, 482 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ dism'd); *see* Tex.R.App.P. 52(a).

Lisa contends that the police report harmed her in two ways: (1) it concluded that Martin's blood/alcohol level was .11 and thus that Martin was intoxicated, and (2) it concluded that Martin was the driver of the pickup. With regard to the first, Lisa did not object to the testimony from the police report that showed Martin's blood/alcohol level to be .11, and thus that he was intoxicated:

Q. (By counsel for Bordens and Vessey): Yes. Now, if we take a look at page 2 of [the police report], it came from the Austin folks, what does it reflect as the blood alcohol level of Mr. Martin?

A. (By Blount, Sr.'s engineer expert): .11.

Because Lisa did not object to this testimony, any complaint stemming from it is waived. *Atlantic Richfield*, 820 S.W.2d at 420; Tex.R.App.P. 52(a).

██ In regard to the second, Lisa judicially admitted that Martin was the driver. Prior to trial, Lisa stipulated to the following:

On May 24, 1986, there was a head-on collision between a Borden's, Inc. truck driven by Kenneth Fred Vessey and a pick-up truck *driven by Frederick M. Martin.*

(Emphasis added.) In her live petition, she states:

At that time [the time of the accident], and on that occasion, decedent [Blount, Jr.]

was riding *as a passenger* in a 1981 Chevrolet pickup truck ...

(Emphasis added.)

These statements are judicial admissions, and are considered "accepted as true by the court and jury and [ ] binding on the pleader." *Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 769 (Tex.1983). Counsel for Bordens and Vessey brought these passages to the court's attention at trial.

We hold that the error, if any, in admitting the police report was waived. We overrule Lisa's thirteenth point of error.

### Lisa's Points of Error 12, 14 and 15 and Blount, Sr.'s Point of Error Two: Evidence Regarding the Autopsy Reports

Lisa's twelfth, fourteenth, and fifteenth points of error (argued together), and Blount, Sr.'s second point of error, each concern the trial court's admission of the autopsy reports on Martin and Blount, Jr., and the court's exclusion of other evidence concerning the reports.

### A. The admission of the reports

In her fourteenth point of error, Lisa contends that the trial court erred in "refusing to exclude hearsay evidence and/or mere speculation" in the autopsy reports. In a portion of his second point of error, Blount, Sr. argues that the court erred in admitting the reports "in part."

The autopsy report on Blount, Jr. was defendant's exhibit two; the autopsy report on Martin was defendant's exhibit three. The reports were admitted during the following exchange:

> Counsel for Lisa: And the, also, Frederick Mark Martin's autopsy report, I join the Defendants in regard to that offer at this time.
>
> The court: Do you have a number?
>
> Counsel for Bordens and Vessey: Yes, Your Honor. Those are Defendant's Exhibits 3 and 4.
>
> The court: No. They're Defendant's Exhibits 2 and 3.

> Counsel for Bordens and Vessey: 2 and 3. I'm sorry, Judge.
>
> (Defendant's Exhibit Numbers 2 and 3 offered into evidence.)
>
> The court: Okay. They're admitted by agreement.
>
> (Defendant's Exhibit Numbers 2 and 3 received into evidence.)
>
> Counsel for Lisa: Thank you, Your Honor.

The record thus demonstrates that Lisa's counsel did not object to, but rather joined in without reservation, the admission of the autopsy reports in their entirety. Nor did Blount, Sr.'s counsel object to the admission of the reports in their entirety. Under these circumstances, Lisa and Blount, Sr. have waived any complaints regarding allegedly improper evidence contained in the reports. Tex.R.App.P. 52(a); *see Burton v. Kirby,* 775 S.W.2d 834, 837 (Tex.App.—Austin 1989, no writ).

We overrule Lisa's fourteenth point of error and the corresponding portion of Blount, Sr.'s second point of error.

### B. Lisa and Blount, Sr.'s offer of proof

In Lisa's twelfth point of error, she argues that the trial court erred in refusing to admit evidence that "challeng[ed] the reliability" and "impeach[ed] the credibility" of the reports. In the remainder of his second point of error, Blount, Sr. asserts that the trial court erred "in excluding appellants' offer of evidence to impeach the autopsy report."

### 1. The standard of review

"The admission or exclusion of evidence during the trial is left to the sound discretion of the trial court." *Ethicon, Inc. v. Martinez,* 835 S.W.2d 826, 831 (Tex.App.—Austin 1992, writ denied); *accord Garza v. Cole,* 753 S.W.2d 245, 247 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). "For the exclusion of evidence to constitute reversible error, the complaining party must show (1) that the trial court committed error, and (2) that the error was reasonably calculated to cause and probably did cause rendition of an im-

proper judgment." *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex.1992).

### 2. The content of the reports

The autopsies were performed by Roberto J. Bayardo, M.D., Chief Medical Examiner of Travis County. Dr. Bayardo also dictated the reports. Like the police report, he concluded that Martin was the driver and Blount, Jr. was the passenger in the pickup.

### 3. The content of the offer

Lisa's counsel, joined by counsel for Blount, Sr., offered the testimony of Aurelio A. Espinola, M.D., Deputy Chief Medical Examiner of Harris County. Through Dr. Espinola, Lisa and Blount, Sr. attempted to cast doubt on the conclusions of the police and autopsy reports that Martin was the driver and Blount, Jr. the passenger. Dr. Espinola testified as follows:

Q. (By counsel for Lisa): Sir, did you also find—or did you read the reports to see that one of the victims was identified as the driver of the vehicle?

A. Yes, ma'am.

Q. Did you search, sir, for things in that report which would be indicative of whether or not that individual was actually the driver of the truck?

A. I examined, and there was a physical evidence contradictory to the labeling of who is the driver and who is the passenger.

Q. So, actually, in looking at those autopsy reports from the evidence that you saw there, it indicates that the opposite is true, that the person labeled as the driver who had the higher blood alcohol was actually the passenger; is that correct?

A. That is my opinion, yes.

Q. And that the person who previously was thought to be the passenger who did not have an elevated blood alcohol level was actually the driver?

A. Yes.[10]

As part of their offer of proof, Lisa and Blount, Sr. also offered three unrelated photographs and portions of two unrelated autopsy reports that were included "in the envelope provided by Dr. Bayardo's office" that contained the autopsy reports and photographs on Martin and Blount, Jr. As with Dr. Espinola's testimony on the autopsy reports on Martin and Blount, Jr., Lisa and Blount, Sr. attempted, through the three unrelated photographs and unrelated autopsy report portions, to cast doubt on the conclusions of the police and autopsy reports that Martin was the driver and Blount, Jr. the passenger.

Two of the photographs were of a middle-aged tattooed man who was also a burn victim. The third photograph was of a 90–year–old man who had died of heart disease.

It is undisputed that neither the tattooed man or the 90–year–old were Martin or Blount, Jr. Nor is it disputed that the portions of the unrelated autopsy reports had nothing to do with the autopsies performed on Martin and Blount, Jr.

The trial court refused to allow the testimony of Dr. Espinola that is quoted above, the three unrelated photographs, and the portions of the two unrelated autopsy reports to reach the jury.

### 4. The propriety of the trial court's decision

▇▇ The appellees argue that, because Lisa and Blount, Sr. judicially admitted that Martin was the driver, the trial court's denial of Lisa and Blount, Sr.'s offer of proof to show that Blount, Jr. was the driver was proper. We agree.

As noted above, Lisa judicially admitted that Martin was the driver. Prior to trial,

---

**10.** Without citation to the record, Lisa argues that the "non-intoxicated body['s]" chest injury was "consistent with a steering wheel injury," further supporting the theory that the unintoxicated Blount, Jr., and not Martin, was the driver of the pickup. Dr. Espinola did not testify that the "non-intoxicated body" had a chest injury consistent with contact with a steering wheel. Nor do we find any other support in the record for this conclusion.

Blount, Sr. entered into the same stipulation of fact as Lisa:

> On May 24, 1986, there was a head-on collision between a Borden's, Inc. truck driven by Kenneth Fred Vessey and a pick-up truck *driven by Frederick M. Martin.*

(Emphasis added.) This is a judicial admission, and is considered "accepted as true by the court and jury and [ ] binding on the pleader." *Musick*, 650 S.W.2d at 769.

Furthermore, it is undisputed that Lisa designated Dr. Espinola as an expert witness *only on the issue of paternity.* Blount, Sr. did not designate Dr. Espinola at all.

Counsel for W.C. objected to Dr. Espinola testifying beyond the scope of his designation. He objected to Dr. Espinola testifying

> to anything other than what [counsel for Lisa] designated him for, which is as a DNA expert. That was the only purpose for which she designated him. She never supplemented anything ... we will object to Dr. Espinola responding to any questions whatsoever other than DNA paternity testing.

The court sustained counsel's objection.

The next day, Lisa filed a "motion to supplement designation of experts." The court denied the motion. Lisa does not raise a point of error or otherwise complain that this was error.[11]

■ In regard to the three unrelated photographs and portions of other autopsy reports, as noted, there is no dispute that these materials did not relate to Martin or Blount, Jr. Lisa contends, however, that TEX.R.CIV.EVID. 106 mandates their admis-

sion, because they "clearly raised a question as to the credibility and accuracy" of the autopsy reports on Martin and Blount, Jr. We find, however, that rule 106 militates *against,* not for, their admission. Rule 106 states:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may at that time introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it. "Writing or recorded statement" includes depositions.

TEX.R.CIV.EVID. 106. The three unrelated photographs and portions of other autopsy reports ought *not* "in fairness" to have been considered here, because they were offered to contradict a fact to which Lisa (and Blount, Sr.) had already stipulated: that Martin was the driver.

Furthermore, as noted, the admission or exclusion of evidence during trial is left to the discretion of the trial court. *Ethicon, Inc.,* 835 S.W.2d at 831; *Garza,* 753 S.W.2d at 247. The judge could properly have concluded that the three unrelated photographs and portions of other autopsy reports were just mistakenly included by the Travis County Medical Examiner's office with the relevant autopsy reports. In fact, Dr. Espinola's own testimony indicates that the pictures may have been included inadvertently:

> Q. Is it possible that these pictures ... could have been on the same roll of the pictures that were taken of Mr. Blount, Jr. and Mr. Martin and simply on the negatives when the court reporter had the film developed; is that possible?
>
> A. Yes, sir.

---

11. The court noted that the extraneous materials, the recent discovery of which had led Lisa's counsel to move the court to let her question Dr. Espinola on the issue of who was driving the pickup at the time of the accident, were produced at Dr. Bayardo's deposition, which was taken well before trial. The judge stated:

> The awareness of them, these photographs were attached by the court reporter to a deposition that was taken[.] [W]hen you read the

deposition or checked the bag is another matter. But it was—it's been part of this record since that deposition was put together.
. . . .
This is the first filing of a motion to supplement designations of experts. We are three-quarters of the way through the trial.
. . . .
Your motion to supplement is denied.

Q. If that were the case, that would not go to show that there were any improper practices or procedures at the Travis County Medical Examiner's Office, would it?

A. No, if that is the case.

In these circumstances, the judge was entitled, in exercising her discretion, to decide that the three photographs and portions of other autopsy reports, which, it is undisputed, did not relate to Martin or Blount, Jr., need not be considered along with the autopsy reports that did relate to Martin and Blount, Jr. The mere inclusion of the extraneous materials, while perhaps indicating a mistake on the part of whoever gathered and sent the autopsy reports on Martin and Blount, Jr., did not itself cast doubt on the "credibility and accuracy" of the *findings* made and reported in the autopsies on Martin and Blount, Jr.

In any event, Lisa and Blount, Jr. have not shown that any error in excluding the three photographs and portions of other autopsy reports "was reasonably calculated to cause and probably did cause rendition of an improper judgment." *McCraw*, 828 S.W.2d at 757. The excluded materials did not directly address the issue of who was driving the pickup when the accident occurred.

We overrule Lisa's twelfth and fifteenth points of error and the corresponding portion of Blount, Sr.'s second point of error.

### Lisa's Point of Error 17: Federal Regulations for Interstate Truck Travel

■ In her seventeenth point of error, Lisa asserts that the trial court erred in excluding evidence that Bordens uses a "lesser standard of care" when hiring and supervising its truck drivers who operate within the state than it does when it supervises its truck drivers who operate "across state lines."

In an offer of proof, Lisa elicited testimony from the Bordens corporate representative that Bordens uses different criteria for the hiring and supervision of intrastate drivers than it does for the hiring and supervision of interstate drivers. The relevant testimony was as follows:

Q. With regard to those drivers, sir, can you tell us whether or not Borden's establishes different criteria for the drivers who transport ... across state lines from those that they use for drivers who only transport material within the State of Texas?

. . . .

A. Yes, there was a different criteria.

Q. So, Borden's used a different criteria for drivers who were transporting materials across state lines than they used for those within the state?

A. They had to follow state and federal regulations.

Q. I understand, but as far as—

A. Those that were interstate were controlled by federal regulations, whereas those that were intrastate were only controlled by state regulations.

. . . .

Q. Okay. So, would you agree with me, sir, that they clearly had a different standard that they applied for the drivers transporting material across state lines than they did for drivers operating vehicles only in the State of Texas?

A. There were two standards, both of which met the laws that applied to those drivers.

When Lisa's counsel first sought to inquire into these matters, counsel for Bordens and Vessey objected on the grounds of relevance. We agree that the testimony is irrelevant. It is undisputed that Vessey is an intrastate driver and that the accident happened in Texas. It is therefore irrelevant that Bordens uses one criteria, which is set according to Texas law, to hire and supervise Texas drivers, and another criteria, which is set according to federal law, to hire and supervise interstate drivers. Only Bordens' com-

pliance with *Texas* law is relevant here. Bordens had no duty to follow any higher federal standard when hiring and supervising intrastate drivers; its duty was to follow the Texas standard. The mere existence of a higher standard somewhere does not create a duty on Bordens to follow it. *See Continental Oil Co. v. Simpson*, 604 S.W.2d 530, 534 (Tex.Civ.App.—Amarillo 1980, writ ref'd n.r.e.).[12]

We overrule Lisa's seventeenth point of error.

### Blount, Sr.'s Point of Error One: Prospective Jurors' Attitudes Toward Alcohol

 In his first point of error, Blount, Sr. contends that the trial court erred "in ruling sua sponte to restrict appellants' qualification of prospective jurors to determine their attitude on use of alcohol." Blount, Sr. complains only in regard to his counsel's questions about Alcoholics Anonymous. The relevant exchange was as follows:

Q. (By counsel for Blount, Sr.): Are you offended by the fact that maybe someone else does [drink]?

A. (By a prospective juror): Used to drink, don't anymore.

Q. Are you in AA?

A. No, I am not.

Q. Are you just—

A. I have been in AA before, yes, several years ago.

. . . .

A. No longer.

. . . .

Q. Never, ever?

A. No.

Q. Is there some reason for that?

A. Personal convictions. Don't need it anymore.

The court: Please approach the bench, [counsel for Blount, Sr.].

The court (outside the hearing of the panel): The definition is not—this is totally inappropriate. You have embarrassed a lot of people here, at least two of them, and scared the rest of them.

"The scope of voir dire examination is a matter within the sound discretion of the trial court." *Dickson v. Burlington N. R.R.*, 730 S.W.2d 82, 85 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.). The record demonstrates that the plaintiffs' counsel were allowed to conduct a thorough, far-reaching inquiry into prospective jurors' attitudes about alcohol. Counsel were permitted to ask how prospective jurors felt about drinking; how they felt about drinking and driving; how they felt about drinking only on certain occasions; about alcohol-related accidents and deaths in which their relatives were involved; about membership in alcohol-related groups such as Alcoholics Anonymous and Mothers Against Drunk Driving; and about other alcohol-related issues. The record reflects that the judge gave considerable latitude to the attorneys to ask prospective jurors about their views and feelings on alcohol.

Blount, Sr. cites no authority to support the proposition that the judge's intervention in his questioning of the prospective juror whom he was asking about Alcoholics Anonymous was error. It appears from the record that the court was concerned that counsel was going too far into what is clearly a personal matter. The trial court may, in the exercise of its discretion in overseeing voir dire, draw a line past which the attorneys may not step in inquiring into the personal lives of prospective jurors. Where that line should be drawn depends on the circumstances of the particular case.

Blount, Sr. has not shown that he was prohibited from asking any particular ques-

---

12. We only *assume* for the purposes of our analysis that the federal standard is actually higher than the state standard in the first place. We do not *hold* that this is so. Regardless of which standard is in fact higher, a review of the testimony in Lisa's offer of proof does not show at all that the federal standard is higher than the state standard.

tion. He has not shown that the court erred in intervening in his inquiry, or that he was in any way harmed by the alleged error. No reversible error occurred. TEX.R.APP.P. 81(b)(1).

We overrule Blount, Sr.'s first point of error.

### Lisa's Point of Error 16 and Blount, Sr.'s Point of Error Three: Cumulative Error

In her sixteenth point of error, Lisa argues that the trial court's alleged errors, "when combined together, constitute cumulative error sufficient to necessitate reversal." In his third point of error, Blount, Sr. contends that the trial court's alleged "restriction of voir dire on the issue of use of alcohol," together with its allegedly erroneous exclusion of his and Lisa's evidence in their offer of proof regarding the autopsy reports, produced cumulative error. Having found no error, we necessarily find no cumulative error.

We overrule Lisa's sixteenth and Blount, Sr.'s third point of error.

### Conclusion

We affirm the judgment of the trial court.